# WALZ *v.* TAX COMMISSION OF THE CITY OF NEW YORK

No. 135. Argued November 19, 1969—Decided May 4, 1970

*Edward J. Ennis* argued the cause for appellant.

*J. Lee Rankin* argued the cause for appellee. With him on the brief were *Stanley Buchsbaum* and *Edith I. Spivack.*

Briefs of *amici curiae* urging reversal were filed by *Osmond K. Fraenkel, Marvin M. Karpatkin, Norman Dorsen, Mr. Ennis,* and *Melvin L. Wulf* for the American Civil Liberties Union, and by *Lola Boswell* for Madalyn Murray O'Hair and *James H. Anderson, Jr.,* for the Society of Separationists, Inc.

Briefs of *amici curiae* urging affirmance were filed by *Louis J. Lefkowitz,* Attorney General, *Samuel A. Hirshowitz,* First Assistant Attorney General, and *Julius Greenfield,* Assistant Attorney General, for the State of New York, joined by the Attorneys General for their respective States as follows: *MacDonald Gallion* of Alabama, *Gary K. Nelson* of Arizona, *Joe Purcell* of Arkansas, *Duke W. Dunbar* of Colorado, *Robert K. Killian* of Connecticut, *David P. Buckson* of Delaware, *Earl Faircloth* of Florida, *Bertram T. Kanbara* of Hawaii, *William J. Scott* of Illinois, *Theodore L. Sendak* of Indiana, *Richard C. Turner* of Iowa, *Kent Frizzell* of Kansas, *John B. Breckinridge* of Kentucky, *Jack P. F. Gremillion* of Louisiana, *James S. Erwin* of Maine, *Francis B. Burch* of Maryland, *Frank J. Kelley* of Michigan, *A. F. Summer* of Mississippi, *John C. Danforth* of Missouri, *Robert L. Woodahl* of Montana, *Clarence A. H. Meyer* of Nebraska, *Arthur J. Sills* of New Jersey, *James A. Maloney* of New Mexico, *Robert B. Morgan* of North Carolina, *Helgi Johanneson* of North Dakota, *Paul W. Brown* of Ohio, *William C. Sennett* of Pennsylvania, *Herbert F. De Simone* of Rhode Island, *Gordon Mydland* of South Dakota, *George F. McCanless* of Tennessee, *Crawford C. Martin* of Texas, *James M. Jeffords* of Vermont, *Robert Y. Button* of Virginia, *Slade Gorton* of Washington, *Robert W. War-*

*ren* of Wisconsin, and *James E. Barrett* of Wyoming, and by *Santiago C. Soler-Favale,* Attorney General of Puerto Rico; by *Franklin C. Salisbury* for Protestants and Other Americans United for Separation of Church and State; by *Noel Thompson* for the Parish Hall School, Inc.; by *Charles H. Tuttle* and *Thomas A. Shaw, Jr.,* for the National Council of the Churches of Christ in the United States; by *Anthony L. Fletcher, Stephen B. Clarkson, John Miles Evans, George F. Mackey, William G. Rhines, William Sherman,* and *H. Richard Schumacher* for the Episcopal Diocese of New York et al.; by *William R. Consedine, George E. Reed, Alfred L. Scanlan, Arthur E. Sutherland,* and *Charles M. Whelan* for the United States Catholic Conference; by *Marvin Braiterman* for the Synagogue Council of America et al.; by *Nathan Lewin* and *Julius Berman* for the National Jewish Commission on Law and Public Affairs; by *Joseph B. Friedman* for the Baptist Joint Committee on Public Affairs; and by *Roy L. Cole* for the Baptist General Convention of Texas.

MR. CHIEF JUSTICE BURGER delivered the opinion of the Court.

Appellant, owner of real estate in Richmond County, New York, sought an injunction in the New York courts to prevent the New York City Tax Commission from granting property tax exemptions to religious organizations for religious properties used solely for religious worship. The exemption from state taxes is authorized by Art. 16, § 1, of the New York Constitution, which provides in relevant part:

> "Exemptions from taxation may be granted only by general laws. Exemptions may be altered or repealed except those exempting real or personal property used exclusively for religious, educational or

charitable purposes as defined by law and owned by any corporation or association organized or conducted exclusively for one or more of such purposes and not operating for profit." [1]

The essence of appellant's contention was that the New York City Tax Commission's grant of an exemption to church property indirectly requires the appellant to make a contribution to religious bodies and thereby violates provisions prohibiting establishment of religion under the First Amendment which under the Fourteenth Amendment is binding on the States. [2]

Appellee's motion for summary judgment was granted and the Appellate Division of the New York Supreme Court, and the New York Court of Appeals affirmed. We noted probable jurisdiction, 395 U. S. 957 (1969), and affirm.

## I

Prior opinions of this Court have discussed the development and historical background of the First Amendment in detail. See *Everson* v. *Board of Education,* 330 U. S. 1 (1947); *Engel* v. *Vitale,* 370 U. S. 421 (1962). It would therefore serve no useful purpose to review in detail the background of the Establishment and Free

---

[1] Art. 16, § 1, of the New York State Constitution is implemented by § 420, subd. 1, of the New York Real Property Tax Law which states in pertinent part:

"Real property owned by a corporation or association organized exclusively for the moral or mental improvement of men and women, or for religious, bible, tract, charitable, benevolent, missionary, hospital, infirmary, educational, public playground, scientific, literary, bar association, medical society, library, patriotic, historical or cemetery purposes . . . and used exclusively for carrying out thereupon one or more of such purposes . . . shall be exempt from taxation as provided in this section."

[2] The First Amendment to the United States Constitution provides in part that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof . . . ."

Exercise Clauses of the First Amendment or to restate what the Court's opinions have reflected over the years.

It is sufficient to note that for the men who wrote the Religion Clauses of the First Amendment the "establishment" of a religion connoted sponsorship, financial support, and active involvement of the sovereign in religious activity. In England, and in some Colonies at the time of the separation in 1776, the Church of England was sponsored and supported by the Crown as a state, or established, church; in other countries "establishment" meant sponsorship by the sovereign of the Lutheran or Catholic Church. See *Engel* v. *Vitale*, 370 U. S., at 428 n. 10. See generally C. Antieau, A. Downey, & E. Roberts, Freedom from Federal Establishment (1964). The exclusivity of established churches in the 17th and 18th centuries, of course, was often carried to prohibition of other forms of worship. See *Everson* v. *Board of Education*, 330 U. S., at 9–11; L. Pfeffer, Church, State and Freedom 71 *et seq.* (1967).

The Establishment and Free Exercise Clauses of the First Amendment are not the most precisely drawn portions of the Constitution. The sweep of the absolute prohibitions in the Religion Clauses may have been calculated; but the purpose was to state an objective, not to write a statute. In attempting to articulate the scope of the two Religion Clauses, the Court's opinions reflect the limitations inherent in formulating general principles on a case-by-case basis. The considerable internal inconsistency in the opinions of the Court derives from what, in retrospect, may have been too sweeping utterances on aspects of these clauses that seemed clear in relation to the particular cases but have limited meaning as general principles.

The Court has struggled to find a neutral course between the two Religion Clauses, both of which are cast in absolute terms, and either of which, if expanded to a

logical extreme, would tend to clash with the other. For example, in *Zorach* v. *Clauson,* 343 U. S. 306 (1952), MR. JUSTICE DOUGLAS, writing for the Court, noted:

"The First Amendment, however, does not say that in every and all respects there shall be a separation of Church and State." *Id.,* at 312.

"We sponsor an attitude on the part of government that shows no partiality to any one group and that lets each flourish according to the zeal of its adherents and the appeal of its dogma." *Id.,* at 313.

MR. JUSTICE HARLAN expressed something of this in his dissent in *Sherbert* v. *Verner,* 374 U. S. 398 (1963), saying that the constitutional neutrality imposed on us

"is not so narrow a channel that the slightest deviation from an absolutely straight course leads to condemnation." *Id.,* at 422.

The course of constitutional neutrality in this area cannot be an absolutely straight line; rigidity could well defeat the basic purpose of these provisions, which is to insure that no religion be sponsored or favored, none commanded, and none inhibited. The general principle deducible from the First Amendment and all that has been said by the Court is this: that we will not tolerate either governmentally established religion or governmental interference with religion. Short of those expressly proscribed governmental acts there is room for play in the joints productive of a benevolent neutrality which will permit religious exercise to exist without sponsorship and without interference.

Each value judgment under the Religion Clauses must therefore turn on whether particular acts in question are intended to establish or interfere with religious beliefs and practices or have the effect of doing so. Adherence to the policy of neutrality that derives from an accommodation of the Establishment and Free Exercise Clauses

has prevented the kind of involvement that would tip the balance toward government control of churches or governmental restraint on religious practice.

Adherents of particular faiths and individual churches frequently take strong positions on public issues including, as this case reveals in the several briefs *amici*, vigorous advocacy of legal or constitutional positions. Of course, churches as much as secular bodies and private citizens have that right. No perfect or absolute separation is really possible; the very existence of the Religion Clauses is an involvement of sorts—one that seeks to mark boundaries to avoid excessive entanglement.

The hazards of placing too much weight on a few words or phrases of the Court is abundantly illustrated within the pages of the Court's opinion in *Everson*. MR. JUSTICE BLACK, writing for the Court's majority, said the First Amendment

> "means at least this: Neither a state nor the Federal Government can . . . pass laws which aid one religion, aid all religions, or prefer one religion over another." 330 U. S., at 15.

Yet he had no difficulty in holding that:

> "Measured by these standards, we cannot say that the First Amendment prohibits New Jersey from spending tax-raised funds to pay the bus fares of parochial school pupils as a part of a general program under which it pays the fares of pupils attending public and other schools. *It is undoubtedly true that children are helped to get to church schools. There is even a possibility that some of the children might not be sent to the church schools if the parents were compelled to pay their children's bus fares out of their own pockets . . . ."* *Id.*, at 17. (Emphasis added.)

The Court did not regard such "aid" to schools teaching a particular religious faith as any more a violation of the Establishment Clause than providing "state-paid policemen, detailed to protect children . . . [at the schools] from the very real hazards of traffic . . . ." *Ibid.*

Mr. Justice Jackson, in perplexed dissent in *Everson*, noted that

> "the undertones of the opinion, advocating complete and uncompromising separation . . . seem utterly discordant with its conclusion . . . ." *Id.*, at 19.

Perhaps so. One can sympathize with Mr. Justice Jackson's logical analysis but agree with the Court's eminently sensible and realistic application of the language of the Establishment Clause. In *Everson* the Court declined to construe the Religion Clauses with a literalness that would undermine the ultimate constitutional objective as illuminated by history. Surely, bus transportation and police protection to pupils who receive religious instruction "aid" that particular religion to maintain schools that plainly tend to assure future adherents to a particular faith by having control of their total education at an early age. No religious body that maintains schools would deny this as an affirmative if not dominant policy of church schools. But if as in *Everson* buses can be provided to carry and policemen to protect church school pupils, we fail to see how a broader range of police and fire protection given equally to all churches, along with nonprofit hospitals, art galleries, and libraries receiving the same tax exemption, is different for purposes of the Religion Clauses.

Similarly, making textbooks available to pupils in parochial schools in common with public schools was surely an "aid" to the sponsoring churches because it relieved those churches of an enormous aggregate cost

for those books. Supplying of costly teaching materials was not seen either as manifesting a legislative purpose to aid or as having a primary effect of aid contravening the First Amendment. *Board of Education* v. *Allen,* 392 U. S. 236 (1968). In so holding the Court was heeding both its own prior decisions and our religious tradition. MR. JUSTICE DOUGLAS, in *Zorach* v. *Clauson, supra,* after recalling that we "are a religious people whose institutions presuppose a Supreme Being," went on to say:

> "We make room for as wide a variety of beliefs and creeds as the spiritual needs of man deem necessary. . . . *When the state encourages religious instruction . . . it follows the best of our traditions.* For it then respects the religious nature of our people and accommodates the public service to their spiritual needs." 343 U. S., at 313–314. (Emphasis added.)

With all the risks inherent in programs that bring about administrative relationships between public education bodies and church-sponsored schools, we have been able to chart a course that preserved the autonomy and freedom of religious bodies while avoiding any semblance of established religion. This is a "tight rope" and one we have successfully traversed.

## II

The legislative purpose of the property tax exemption is neither the advancement nor the inhibition of religion; it is neither sponsorship nor hostility. New York, in common with the other States, has determined that certain entities that exist in a harmonious relationship to the community at large, and that foster its "moral or mental improvement," should not be inhibited in their activities by property taxation or the hazard of loss of those properties for nonpayment of taxes. It

has not singled out one particular church or religious group or even churches as such; rather, it has granted exemption to all houses of religious worship within a broad class of property owned by nonprofit, quasi-public corporations which include hospitals, libraries, playgrounds, scientific, professional, historical, and patriotic groups. The State has an affirmative policy that considers these groups as beneficial and stabilizing influences in community life and finds this classification useful, desirable, and in the public interest. Qualification for tax exemption is not perpetual or immutable; some tax-exempt groups lose that status when their activities take them outside the classification and new entities can come into being and qualify for exemption.

Governments have not always been tolerant of religious activity, and hostility toward religion has taken many shapes and forms—economic, political, and sometimes harshly oppressive. Grants of exemption historically reflect the concern of authors of constitutions and statutes as to the latent dangers inherent in the imposition of property taxes; exemption constitutes a reasonable and balanced attempt to guard against those dangers. The limits of permissible state accommodation to religion are by no means co-extensive with the noninterference mandated by the Free Exercise Clause. To equate the two would be to deny a national heritage with roots in the Revolution itself. See *Sherbert* v. *Verner,* 374 U. S. 398, 423 (1963) (HARLAN, J., dissenting); *Braunfeld* v. *Brown,* 366 U. S. 599, 608 (1961). See generally Kauper, The Constitutionality of Tax Exemptions for Religious Activities in The Wall Between Church and State 95 (D. Oaks ed. 1963). We cannot read New York's statute as attempting to establish religion; it is simply sparing the exercise of religion from the burden of property taxation levied on private profit institutions.

We find it unnecessary to justify the tax exemption on the social welfare services or "good works" that some churches perform for parishioners and others—family counselling, aid to the elderly and the infirm, and to children. Churches vary substantially in the scope of such services; programs expand or contract according to resources and need. As public-sponsored programs enlarge, private aid from the church sector may diminish. The extent of social services may vary, depending on whether the church serves an urban or rural, a rich or poor constituency. To give emphasis to so variable an aspect of the work of religious bodies would introduce an element of governmental evaluation and standards as to the worth of particular social welfare programs, thus producing a kind of continuing day-to-day relationship which the policy of neutrality seeks to minimize. Hence, the use of a social welfare yardstick as a significant element to qualify for tax exemption could conceivably give rise to confrontations that could escalate to constitutional dimensions.

Determining that the legislative purpose of tax exemption is not aimed at establishing, sponsoring, or supporting religion does not end the inquiry, however. We must also be sure that the end result—the effect—is not an excessive government entanglement with religion. The test is inescapably one of degree. Either course, taxation of churches or exemption, occasions some degree of involvement with, religion. Elimination of exemption would tend to expand the involvement of government by giving rise to tax valuation of church property, tax liens, tax foreclosures, and the direct confrontations and conflicts that follow in the train of those legal processes.

Granting tax exemptions to churches necessarily operates to afford an indirect economic benefit and also gives rise to some, but yet a lesser, involvement than taxing

them. In analyzing either alternative the questions are whether the involvement is excessive, and whether it is a continuing one calling for official and continuing surveillance leading to an impermissible degree of entanglement. Obviously a direct money subsidy would be a relationship pregnant with involvement and, as with most governmental grant programs, could encompass sustained and detailed administrative relationships for enforcement of statutory or administrative standards, but that is not this case. The hazards of churches supporting government are hardly less in their potential than the hazards of government supporting churches; [3] each relationship carries some involvement rather than the desired insulation and separation. We cannot ignore the instances in history when church support of government led to the kind of involvement we seek to avoid.

The grant of a tax exemption is not sponsorship since the government does not transfer part of its revenue to churches but simply abstains from demanding that the church support the state. No one has ever suggested that tax exemption has converted libraries, art galleries, or hospitals into arms of the state or put employees "on the public payroll." There is no genuine nexus between tax exemption and establishment of religion. As Mr. Justice Holmes commented in a related context "a page of

---

[3] The support of religion with direct allocation of public revenue was a common colonial practice. See C. Antieau, A. Downey, & E. Roberts, Freedom from Federal Establishment cc. 1 and 2 (1964). A general assessment proposed in the Virginia Legislature in 1784 prompted the writing of James Madison's Remonstrance. See opinion of MR. JUSTICE DOUGLAS dissenting, post, at 704–706; 716–727. Governmental support of religion is common in many countries. See e. g., R. Murray, A Brief History of the Church of Sweden 75 (1961); G. Codding, The Federal Government of Switzerland 53–54 (1961); M. Scehic, Zbirka Propisa o Doprinosima i Porezima Gradjana 357 (Yugoslavia) (1968).

history is worth a volume of logic." *New York Trust Co.* v. *Eisner,* 256 U. S. 345, 349 (1921). The exemption creates only a minimal and remote involvement between church and state and far less than taxation of churches. It restricts the fiscal relationship between church and state, and tends to complement and reinforce the desired separation insulating each from the other.

Separation in this context cannot mean absence of all contact; the complexities of modern life inevitably produce some contact and the fire and police protection received by houses of religious worship are no more than incidental benefits accorded all persons or institutions within a State's boundaries, along with many other exempt organizations. The appellant has not established even an arguable quantitative correlation between the payment of an ad valorem property tax and the receipt of these municipal benefits.

All of the 50 States provide for tax exemption of places of worship, most of them doing so by constitutional guarantees. For so long as federal income taxes have had any potential impact on churches—over 75 years— religious organizations have been expressly exempt from the tax.[4] Such treatment is an "aid" to churches no more and no less in principle than the real estate tax exemption granted by States. Few concepts are more deeply embedded in the fabric of our national life, beginning with pre-Revolutionary colonial times, than for the government to exercise at the very least this kind of benevolent neutrality toward churches and religious exer-

---

[4] Act of August 27, 1894, § 32, 28 Stat. 556. Following passage of the Sixteenth Amendment, federal income tax acts have consistently exempted corporations and associations, organized and operated exclusively for religious purposes along with eleemosynary groups, from payment of the tax. Act of Oct. 3, 1913, § IIG (a), 38 Stat. 172. See Int. Rev. Code of 1954, § 501 *et seq.,* 26 U. S. C. § 501 *et seq.*

cise generally so long as none was favored over others and none suffered interference.

It is significant that Congress, from its earliest days, has viewed the Religion Clauses of the Constitution as authorizing statutory real estate tax exemption to religious bodies. In 1802 the 7th Congress enacted a taxing statute for the County of Alexandria, adopting the 1800 Virginia statutory pattern which provided tax exemptions for churches. 2 Stat. 194.[5] As early as 1813 the 12th Congress refunded import duties paid by religious societies on the importation of religious articles.[6] During this period the City Council of Washington, D. C., acting under congressional authority, Act of Incorporation, § 7, 2 Stat. 197 (May 3, 1802), enacted a series of real and personal property assessments that uniformly exempted church property.[7] In 1870 the Congress specifically exempted all churches in the District of Colum-

---

[5] In 1798 Congress passed an Act to provide for the valuation of lands and dwelling houses. All existing state exemptions were expressly excluded from the aforesaid valuation and enumeration. Act of July 9, 1798, § 8, 1 Stat. 585. Subsequent levies of direct taxes expressly or impliedly incorporated existing state exemptions. Act of July 14, 1798, § 2, 1 Stat. 598 (express incorporation of state exemption). See Act of Aug. 2, 1813, § 4, 3 Stat. 71; Act of Jan. 9, 1815, § 5, 3 Stat. 166 (express incorporation of state exemptions).

[6] See 6 Stat. 116 (1813), relating to plates for printing Bibles. See also 6 Stat. 346 (1826) relating to church vestments, furniture, and paintings; 6 Stat. 162 (1816), Bible plates; 6 Stat. 600 (1834), and 6 Stat. 675 (1836), church bells.

[7] See, e. g., Acts of the Corporation of the City of Washington, First Council, c. V, approved Oct. 6, 1802, p. 13; Acts of the Corporation of the City of Washington, Second Council, § 1, approved Sept. 12, 1803, p. 13; Acts of the Corporation of the City of Washington, Third Council, § 1, approved Sept. 5, 1804, p. 13. Succeeding Acts of the Corporation impliedly renewed the exemption in subsequent assessments. See, e. g., Acts of the Corporation of the City of Washington, Thirteenth Council, c. 19, § 2, approved July 27, 1815, p. 24.

bia and appurtenant grounds and property "from any and all taxes or assessments, national, municipal, or county." Act of June 17, 1870, 16 Stat. 153.[8]

It is obviously correct that no one acquires a vested or protected right in violation of the Constitution by long use, even when that span of time covers our entire national existence and indeed predates it. Yet an unbroken practice of according the exemption to churches, openly and by affirmative state action, not covertly or by state inaction, is not something to be lightly cast aside. Nearly 50 years ago Mr. Justice Holmes stated:

> "If a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it. . . ." *Jackman* v. *Rosenbaum Co.*, 260 U. S. 22, 31 (1922).

Nothing in this national attitude toward religious tolerance and two centuries of uninterrupted freedom from taxation has given the remotest sign of leading to an established church or religion and on the contrary it has operated affirmatively to help guarantee the free exercise of all forms of religious belief. Thus, it is hardly useful to suggest that tax exemption is but the "foot in the door" or the "nose of the camel in the tent" leading to an established church. If tax exemption can be seen as this first step toward "establishment" of religion, as MR. JUSTICE DOUGLAS fears, the second step has been long in coming. Any move that realistically "establishes" a church or tends to do so can be dealt with "while this Court sits."

Mr. Justice Cardozo commented in The Nature of the Judicial Process 51 (1921) on the "tendency of a prin-

---

[8] Subsequent Acts of Congress carried over the substance of the exemption. Act of July 12, 1876, § 8, 19 Stat. 85; Act of March 3, 1877, § 8, 19 Stat. 399; Act of August 15, 1916, 39 Stat. 514; D. C. Code Ann. § 47–801a (1967).

ciple to expand itself to the limit of its logic"; such expansion must always be contained by the historical frame of reference of the principle's purpose and there is no lack of vigilance on this score by those who fear religious entanglement in government.

The argument that making "fine distinctions" between what is and what is not absolute under the Constitution is to render us a government of men, not laws, gives too little weight to the fact that it is an essential part of adjudication to draw distinctions, including fine ones, in the process of interpreting the Constitution. We must frequently decide, for example, what are "reasonable" searches and seizures under the Fourth Amendment. Determining what acts of government tend to establish or interfere with religion falls well within what courts have long been called upon to do in sensitive areas.

It is interesting to note that while the precise question we now decide has not been directly before the Court previously, the broad question was discussed by the Court in relation to real estate taxes assessed nearly a century ago on land owned by and adjacent to a church in Washington, D. C.[9] At that time Congress granted real estate tax exemptions to buildings devoted to art, to institutions of public charity, libraries, cemeteries, and "church buildings, and grounds actually occupied by such buildings." In denying tax exemption as to land owned by but not used for the church, but rather to produce income, the Court concluded:

> "In the exercise of this [taxing] power, Congress, like any State legislature unrestricted by constitutional provisions, may at its discretion wholly exempt certain classes of property from taxation, or

---

[9] *Gibbons* v. *District of Columbia*, 116 U. S. 404 (1886). Cf. *Washington Ethical Society* v. *District of Columbia*, 101 U. S. App. D. C. 371, 249 F. 2d 127 (1957).

may tax them at a lower rate than other property." *Gibbons* v. *District of Columbia,* 116 U. S. 404, 408 (1886).

It appears that at least up to 1885 this Court, reflecting more than a century of our history and uninterrupted practice, accepted without discussion the proposition that federal or state grants of tax exemption to churches were not a violation of the Religion Clauses of the First Amendment. As to the New York statute, we now confirm that view.

*Affirmed.*

MR. JUSTICE BRENNAN, concurring.

I concur for reasons expressed in my opinion in *Abington School Dist.* v. *Schempp,* 374 U. S. 203, 230 (1963). I adhere to the view there stated that to give concrete meaning to the Establishment Clause,

> "the line we must draw between the permissible and the impermissible is one which accords with history and faithfully reflects the understanding of the Founding Fathers. It is a line which the Court has consistently sought to mark in its decisions expounding the religious guarantees of the First Amendment. What the Framers meant to foreclose, and what our decisions under the Establishment Clause have forbidden, are those involvements of religious with secular institutions which (a) serve the essentially religious activities of religious institutions; (b) employ the organs of government for essentially religious purposes; or (c) use essentially religious means to serve governmental ends, where secular means would suffice. When the secular and religious institutions become involved in such a manner, there inhere in the relationship precisely those

dangers—as much to church as to state—which the Framers feared would subvert religious liberty and the strength of a system of secular government. On the other hand, there may be myriad forms of involvements of government with religion which do not import such dangers and therefore should not, in my judgment, be deemed to violate the Establishment Clause." *Id.*, at 294–295.

Thus, in my view, the history, purpose, and operation of real property tax exemptions for religious organizations must be examined to determine whether the Establishment Clause is breached by such exemptions. See *id.*, at 293.

I

The existence from the beginning of the Nation's life of a practice, such as tax exemptions for religious organizations, is not conclusive of its constitutionality. But such practice is a fact of considerable import in the interpretation of abstract constitutional language. On its face, the Establishment Clause is reasonably susceptible of different interpretations regarding the exemptions. This Court's interpretation of the clause, accordingly, is appropriately influenced by the reading it has received in the practices of the Nation. As Mr. Justice Holmes observed in an analogous context, in resolving such questions of interpretation "a page of history is worth a volume of logic." *New York Trust Co.* v. *Eisner,* 256 U. S. 345, 349 (1921). The more longstanding and widely accepted a practice, the greater its impact upon constitutional interpretation. History is particularly compelling in the present case because of the undeviating acceptance given religious tax exemptions from our earliest days as a Nation. Rarely if ever has this Court considered the constitutionality of a practice for which the historical support is so overwhelming.

The Establishment Clause, along with the other provisions of the Bill of Rights, was ratified by the States in 1791. Religious tax exemptions were not an issue in the petitions calling for the Bill of Rights, in the pertinent congressional debates, or in the debates preceding ratification by the States.[1] The absence of concern about the exemptions could not have resulted from failure to foresee the possibility of their existence, for they were widespread during colonial days.[2] Rather, it seems clear that the exemptions were not among the evils that the Framers and Ratifiers of the Establishment Clause sought to avoid. Significantly, within a decade after ratification, at least four States passed statutes exempting the property of religious organizations from taxation.[3]

Although the First Amendment may not have applied to the States during this period, practice in Virginia at the time is nonetheless instructive. The Commonwealth's efforts to separate church and state provided the direct antecedents of the First Amendment, see *McGowan* v. *Maryland,* 366 U. S. 420, 437–440 (1961); *Abington School Dist.* v. *Schempp, supra,* at 233–234

---

[1] In fact, it does not appear that the exemptions were even discussed. See, *e. g.,* C. Antieau, P. Carroll, & T. Burke, Religion Under the State Constitutions 122 (1965): "As far as anyone has been able to discover, the topic was never mentioned in the debates which took place prior to the adoption of the First Amendment."

[2] See, *e. g.,* C. Antieau, A. Downey, & E. Roberts, Freedom from Federal Establishment 20–21, 73–74, 175 (1964); cf. 3 A. Stokes, Church and State in the United States 419 (1950).

[3] 2 Del. Laws of 1700–1797, p. 1247 (Act of Feb. 9, 1796); 2 Md. Laws (1785–1799, Kilty), c. 89 (Act of Jan. 20, 1798); N. Y. Laws of 1797–1800, c. 72, at 414 (Act of April 1, 1799); 2 Va. Statutes at Large of 1792–1806 (Shepherd) 200 (Act of Jan. 23, 1800). See also 16 Penn. Statutes at Large of 1682–1801, at 379 (Act of April 11, 1799). For practice in other States, see the accounts in Antieau, Carroll, & Burke, *supra,* n. 1, at 123–169; Antieau, Downey, & Roberts, *supra,* n. 2, at 73–74; C. Zollmann, American Civil Church Law 238–242 (1917).

(BRENNAN, J., concurring); *Everson* v. *Board of Education,* 330 U. S. 1, 33–38 (1947) (Rutledge, J., dissenting), and Virginia remained unusually sensitive to the proper relation between church and state during the years immediately following ratification of the Establishment Clause. Virginia's protracted movement to disestablish the Episcopal Church culminated in the passage on January 24, 1799, of "An ACT to repeal certain acts, and to declare the construction of the [Virginia] bill of rights and constitution, concerning religion." The 1799 Act stated that the Virginia Bill of Rights had "excepted from the powers given to the [civil] government, the power of reviving any species of ecclesiastical or church government . . . by referring the subject of religion to conscience" and that the repealed measures had "bestowed property upon [the Anglican] church," had "asserted a legislative right to establish any religious sect," and had "incorporated religious sects, all of which is inconsistent with the principles of the constitution, and of religious freedom, and manifestly tends to the re-establishment of a national church." 2 Va. Statutes at Large of 1792–1806 (Shepherd) 149. Yet just one year after the passage of this Act, Virginia re-enacted a measure exempting from taxation property belonging to "any . . . college, houses for divine worship, or seminary of learning." *Id.,* at 200. This exemption dated at least from 1777 and had been reaffirmed immediately before and after ratification of the First Amendment. See 9 Va. Statutes at Large (1775–1778, Hening), at 351; 13 Va. Statutes at Large (1789–1792, Hening), at 112, 241, 336–337. It may reasonably be inferred that the Virginians did not view the exemption for "houses of divine worship" as an establishment of religion.

Similarly, in 1784 the New York Legislature repealed colonial acts establishing the Episcopal Church in several counties of the State. See N. Y. Laws of 1777–1784,

c. 38, p. 661. Yet in 1799, the legislature provided that "no house or land belonging to . . . any church or place of public worship, . . . nor any college or incorporated academy, nor any school house, . . . alms house or property belonging to any incorporated library, shall be taxed by virtue of this act." N. Y. Laws of 1797–1800, c. 72, at 414. And early practice in the District of Columbia—governed from the outset by the First Amendment—mirrored that in the States. In 1802 the Corporation of the City of Washington, under authority delegated by Congress, exempted "houses for public worship" from real property taxes. Acts of the Corporation of the City of Washington, First Council, c. V, approved Oct. 6, 1802, p. 13. See also the congressional Acts cited in the Court's opinion, *ante,* at 677–678.

Thomas Jefferson was President when tax exemption was first given Washington churches, and James Madison sat in sessions of the Virginia General Assembly that voted exemptions for churches in that Commonwealth.[4] I have found no record of their personal views on the respective Acts.[5] The absence of such a record is itself

---

[4] See, *e. g.,* E. Swem & J. Williams, A Register of the General Assembly of Virginia, 1776–1918, p. 53 (1918); Journal of the House of Delegates of the Commonwealth of Virginia 94, 98 (1799–1800).

[5] In an essay written after he had left the presidency, Madison did argue against tax exemptions for churches, the incorporation of ecclesiastical bodies with the power of acquiring and holding property in perpetuity, the right of the Houses of Congress to choose chaplains who are paid out of public funds, the provision of chaplains in the Army and Navy, and presidential proclamations of days of thanksgiving or prayer—though he admitted proclaiming several such days at congressional request. See Fleet, Madison's "Detatched Memoranda," 3 Wm. & Mary Q. (3d ser.) 534, 555–562 (1946). These arguments were advanced long after the passage of the Virginia exemption discussed in the text, *supra,* and even longer after the adoption of the Establishment Clause. They represent at most an extreme view of church-state relations, which Madison himself

significant. It is unlikely that two men so concerned with the separation of church and state would have remained silent had they thought the exemptions established religion. And if they had not either approved the exemptions, or been mild in their opposition, it is probable that their views would be known to us today. Both Jefferson and Madison wrote prolifically about issues they felt important, and their opinions were well known to contemporary chroniclers. See, for example, the record preserved of Madison's battle in 1784–1785 against the proposal in the Virginia Assembly to levy a general tax to support "Teachers of the Christian Religion," in the dissenting opinion of MR. JUSTICE DOUGLAS, *post*, at 704–706, 719–727. Much the same can be said of the other Framers and Ratifiers of the Bill of Rights who remained active in public affairs during the late 18th and early 19th centuries. The adoption of the early exemptions without controversy, in other words, strongly suggests that they were not thought incompatible with constitutional prohibitions against involvements of church and state.

The exemptions have continued uninterrupted to the present day. They are in force in all 50 States. No judicial decision, state or federal, has ever held that they violate the Establishment Clause. In 1886, for example, this Court in *Gibbons* v. *District of Columbia*, 116 U. S. 404, rejected on statutory grounds a church's claim for the exemption of certain of its land under congressional statutes exempting Washington churches and appurtenant ground from real property taxes. But the Court

---

may have reached only late in life. He certainly expressed no such understanding of Establishment during the debates on the First Amendment. See 1 Annals of Cong. 434, 730–731, 755 (1789). And even if he privately held these views at that time, there is no evidence that they were shared by others among the Framers and Ratifiers of the Bill of Rights.

gave not the slightest hint that it ruled against the church because, under the First Amendment, *any* exemption would have been unconstitutional. To the contrary, the Court's opinion implied that nothing in the Amendment precludes exemption of church property: "We are not disposed to deny that grounds left open around a church, not merely to admit light and air, but also to add to its beauty and attractiveness, may, if not used or intended to be used for any other purpose, be exempt from taxation under these statutes." *Id.*, at 407.[6]

Mr. Justice Holmes said that "[i]f a thing has been practised for two hundred years by common consent, it will need a strong case for the Fourteenth Amendment to affect it . . . ." *Jackman* v. *Rosenbaum Co.*, 260 U. S. 22, 31 (1922). For almost 200 years the view expressed in the actions of legislatures and courts has been that tax exemptions for churches do not threaten "those consequences which the Framers deeply feared" or "tend to promote that type of interdependence between religion and state which the First Amendment was designed to prevent." *Schempp, supra,* at 236 (BRENNAN, J., concurring). An examination both of the governmental purposes for granting the exemptions and of the type of

---

[6] See also, *e. g., Bell's Gap R. Co.* v. *Pennsylvania,* 134 U. S. 232, 237 (1890), where the Court stated: "The provision in the Fourteenth Amendment, that no State shall deny to any person within its jurisdiction the equal protection of the laws, was not intended to prevent a State from adjusting its system of taxation in all proper and reasonable ways. It may, if it chooses, exempt certain classes of property from any taxation at all, such as churches, libraries and the property of charitable institutions." Indeed, the Court seems always to have viewed attacks upon the constitutionality of the exemptions as wholly frivolous. See, *e. g., Lundberg* v. *County of Alameda,* 46 Cal. 2d 644, 298 P. 2d 1, appeal dismissed *sub nom. Heisey* v. *County of Alameda,* 352 U. S. 921 (1956); *General Finance Corp.* v. *Archetto,* 93 R. I. 392, 176 A. 2d 73 (1961), appeal dismissed, 369 U. S. 423 (1962).

church-state relationship that has resulted from their existence makes clear that no "strong case" exists for holding unconstitutional this historic practice.[7]

## II

Government has two basic secular purposes for granting real property tax exemptions to religious organizations.[8]  First, these organizations are exempted because they, among a range of other private, nonprofit organizations contribute to the well-being of the community in a variety of nonreligious ways, and thereby bear burdens that would otherwise either have to be met by general taxation, or be left undone, to the detriment of the community.  See, for example, 1938 N. Y. Constitutional Convention, Report of the Committee on Taxation, Doc. No. 2, p. 2.  Thus, New York exempts "[r]eal property owned by a corporation or association

---

[7] Compare the very different situation regarding prayers in public schools.  The practice was not widespread at the time of the adoption of the First Amendment.  Legislative authorization for the prayers came much later and then only in a relatively small number of States.  Moreover, courts began to question the constitutionality of the practice by the late 19th century.  The prayers were found unconstitutional by courts in six States and by state attorneys general in several others.  See 374 U. S., at 270, 274–275.

[8] The only governmental purposes germane to the present inquiry, of course, are those that now exist.  As I said in *Schempp*, "In the *Sunday Law Cases*, we found in state laws compelling a uniform day of rest from worldly labor no violation of the Establishment Clause . . . .  The basic ground of our decision was that, granted the Sunday Laws were first enacted for religious ends, they were continued in force for reasons wholly secular, namely, to provide a universal day of rest and ensure the health and tranquillity of the community.  In other words, government may originally have decreed a Sunday day of rest for the impermissible purpose of supporting religion but abandoned that purpose and retained the laws for the permissible purpose of furthering overwhelmingly secular ends."  374 U. S., at 263–264.

organized exclusively for the moral or mental improvement of men and women, or for religious, bible, tract, charitable, benevolent, missionary, hospital, infirmary, educational, public playground, scientific, literary, bar association, medical society, library, patriotic, historical or cemetery purposes, for the enforcement of laws relating to children or animals, or for two or more such purposes . . . ."  N. Y. Real Prop. Tax Law § 420, subd. 1 (Supp. 1969–1970).

Appellant seeks to avoid the force of this secular purpose of the exemptions by limiting his challenge to "exemptions from real property taxation to religious organizations on real property used exclusively for religious purposes."  Appellant assumes, apparently, that church-owned property is used for exclusively religious purposes if it does not house a hospital, orphanage, weekday school, or the like.  Any assumption that a church building itself is used for exclusively religious activities, however, rests on a simplistic view of ordinary church operations.  As the appellee's brief cogently observes, "the public welfare activities and the sectarian activities of religious institutions are . . . intertwined . . . .  Often a particular church will use the same personnel, facilities and source of funds to carry out both its secular and religious activities."  Thus, the same people who gather in church facilities for religious worship and study may return to these facilities to participate in Boy Scout activities, to promote antipoverty causes, to discuss public issues, or to listen to chamber music.  Accordingly, the funds used to maintain the facilities as a place for religious worship and study also maintain them as a place for secular activities beneficial to the community as a whole.  Even during formal worship services, churches frequently collect the funds used to finance

their secular operations and make decisions regarding their nature.

Second, government grants exemptions to religious organizations because they uniquely contribute to the pluralism of American society by their religious activities. Government may properly include religious institutions among the variety of private, nonprofit groups that receive tax exemptions, for each group contributes to the diversity of association, viewpoint, and enterprise essential to a vigorous, pluralistic society. See *Washington Ethical Society* v. *District of Columbia,* 101 U. S. App. D. C. 371, 373, 249 F. 2d 127, 129 (1957). To this end, New York extends its exemptions not only to religious and social service organizations but also to scientific, literary, bar, library, patriotic, and historical groups, and generally to institutions "organized exclusively for the moral or mental improvement of men and women." The very breadth of this scheme of exemptions negates any suggestion that the State intends to single out religious organizations for special preference. The scheme is not designed to inject any religious activity into a nonreligious context, as was the case with school prayers. No particular activity of a religious organization—for example, the propagation of its beliefs—is specially promoted by the exemptions. They merely facilitate the existence of a broad range of private, nonprofit organizations, among them religious groups, by leaving each free to come into existence, then to flourish or wither, without being burdened by real property taxes.

## III

Although governmental purposes for granting religious exemptions may be wholly secular, exemptions can nonetheless violate the Establishment Clause if they result in

extensive state involvement with religion. Accordingly, those who urge the exemptions' unconstitutionality argue that exemptions are the equivalent of governmental subsidy of churches. General subsidies of religious activities would, of course, constitute impermissible state involvement with religion.

Tax exemptions and general subsidies, however, are qualitatively different. Though both provide economic assistance,[9] they do so in fundamentally different ways. A subsidy involves the direct transfer of public monies to the subsidized enterprise and uses resources exacted from taxpayers as a whole. An exemption, on the other hand, involves no such transfer.[10] It assists the exempted enterprise only passively, by relieving a privately funded venture of the burden of paying taxes. In other words,

_____

[9] In certain circumstances, of course, the economic value of a subsidy exceeds that of an exemption. If the only state assistance received by a religious organization is a real property tax exemption, the church must raise privately every cent that it spends. If, on the other hand, the only state aid to a church is a general subsidy, the church is relieved of the need to support itself to the extent that its subsidy payments from the State exceed its tax payments to the State. Thus, to take the extreme case, a lightly taxed religious organization that received a large, general subsidy could purchase property, construct buildings and maintain its program wholly at public expense. Such dependence on state support is impossible when the only aid provided is a real property tax exemption.

[10] A real property tax exemption cannot be viewed as the free provision by the State of certain basic services—fire, police, water, and the like. As the Court, *ante*, at 676, points out, "the fire and police protection received by houses of religious worship are no more than incidental benefits accorded all persons or institutions within a State's boundaries, along with many other exempt organizations. The appellant has not established even an arguable quantitative correlation between the payment of an ad valorem property tax and the receipt of these municipal benefits." See generally Bittker, Churches, Taxes and the Constitution, 78 Yale L. J. 1285, 1304–1310 (1969).

"[i]n the case of direct subsidy, the state forcibly diverts the income of both believers and nonbelievers to churches," while "[i]n the case of an exemption, the state merely refrains from diverting to its own uses income independently generated by the churches through voluntary contributions." Giannella, Religious Liberty, Nonestablishment, and Doctrinal Development, pt. II, 81 Harv. L. Rev. 513, 553 (1968). Thus, "the symbolism of tax exemption is significant as a manifestation that organized religion is not expected to support the state; by the same token the state is not expected to support the church." Freund, Public Aid to Parochial Schools, 82 Harv. L. Rev. 1680, 1687 n. 16 (1969). Tax exemptions, accordingly, constitute mere passive state involvement with religion and not the affirmative involvement characteristic of outright governmental subsidy.[11]

Even though exemptions produce only passive state involvement with religion, nonetheless some argue that their termination would be desirable as a means of reducing the level of church-state contact. But it cannot realistically be said that termination of religious tax exemptions would quantitatively lessen the extent of state involvement with religion. Appellee contends that "[a]s a practical matter, the public welfare activities and the sectarian activities of religious institutions are so intertwined that they cannot be separated for the purpose of determining eligibility for tax exemptions." If not impossible, the separation would certainly involve extensive state investigation into church operations and finances. Moreover, the termination of exemptions would give rise, as the Court says, to the necessity for "tax valuation of church property, tax liens, tax foreclosures, and the direct confrontations and conflicts that follow in the train of those legal processes." *Ante*,

---

[11] See also, *e. g.*, Bittker, *supra*, n. 10, at 1285–1304.

at 674. Taxation, further, would bear unequally on different churches, having its most disruptive effect on those with the least ability to meet the annual levies assessed against them. And taxation would surely influence the allocation of church resources. By diverting funds otherwise available for religious or public service purposes to the support of the Government, taxation would necessarily affect the extent of church support for the enterprises that they now promote. In many instances, the public service activities would bear the brunt of the reallocation, as churches looked first to maintain their places and programs of worship. In short, the cessation of exemptions would have a significant impact on religious organizations. Whether Government grants or withholds the exemptions, it is going to be involved with religion.[12]

## IV

Against the background of this survey of the history, purpose, and operation of religious tax exemptions, I must conclude that the exemptions do not "serve the essentially religious activities of religious institutions." Their principal effect is to carry out secular purposes—the encouragement of public service activities and of a pluralistic society. During their ordinary operations, most churches engage in activities of a secular nature

---

[12] The state involvement with religion that would be occasioned by any cessation of exemptions might conflict with the demands of the Free Exercise Clause. Cf. *Presbyterian Church* v. *Mary Eliz. Blue Hull Church*, 393 U. S. 440 (1969); *Maryland & Virginia Eldership of the Churches of God* v. *Church of God at Sharpsburg, Inc.*, 396 U. S. 367, 368–370 (1970) (BRENNAN, J., concurring). It is unnecessary to reach any questions of free exercise in the present case, however. And while I believe that "hostility, not neutrality, would characterize the refusal to provide [the exemptions] . . . , I do not say that government *must* provide [them], or that the courts should intercede if it fails to do so." 374 U. S., at 299.

that benefit the community; and all churches by their existence contribute to the diversity of association, viewpoint, and enterprise so highly valued by all of us.

Nor do I find that the exemptions "employ the organs of government for essentially religious purposes." To the extent that the exemptions further secular ends, they do not advance "essentially religious purposes." To the extent that purely religious activities are benefited by the exemptions, the benefit is passive. Government does not affirmatively foster these activities by exempting religious organizations from taxes, as it would were it to subsidize them. The exemption simply leaves untouched that which adherents of the organization bring into being and maintain.

Finally, I do not think that the exemptions "use essentially religious means to serve governmental ends, where secular means would suffice." The means churches use to carry on their public service activities are not "essentially religious" in nature. They are the same means used by any purely secular organization—money, human time and skills, physical facilities. It is true that each church contributes to the pluralism of our society through its purely religious activities, but the state encourages these activities not because it champions religion *per se* but because it values religion among a variety of private, nonprofit enterprises that contribute to the diversity of the Nation. Viewed in this light, there is no nonreligious substitute for religion as an element in our societal mosaic, just as there is no nonliterary substitute for literary groups.

As I said in *Schempp*, the First Amendment does not invalidate "the propriety of certain tax . . . exemptions which incidentally benefit churches and religious institutions, along with many secular charities and nonprofit organizations. . . . [R]eligious institutions simply share benefits which government makes generally available

to educational, charitable, and eleemosynary groups. There is no indication that taxing authorities have used such benefits in any way to subsidize worship or foster belief in God." 374 U. S., at 301.

Opinion of MR. JUSTICE HARLAN.

While I entirely subscribe to the result reached today and find myself in basic agreement with what THE CHIEF JUSTICE has written, I deem it appropriate, in view of the radiations of the issues involved, to state those considerations that are, for me, controlling in this case and lead me to conclude that New York's constitutional provision, as implemented by its real property law, does not offend the Establishment Clause. Preliminarily, I think it relevant to face up to the fact that it is far easier to agree on the purpose that underlies the First Amendment's Establishment and Free Exercise Clauses than to obtain agreement on the standards that should govern their application. What is at stake as a matter of policy is preventing that kind and degree of government involvement in religious life that, as history teaches us, is apt to lead to strife and frequently strain a political system to the breaking point.

## I

Two requirements frequently articulated and applied in our cases for achieving this goal are "neutrality" and "voluntarism." *E. g.,* see *Abington School Dist.* v. *Schempp,* 374 U. S. 203, 305 (1963) (concurring opinion of Mr. Justice Goldberg); *Engel* v. *Vitale,* 370 U. S. 421 (1962). These related and mutually reinforcing concepts are short-form for saying that the Government must neither legislate to accord benefits that favor religion over nonreligion, nor sponsor a particular sect, nor try to encourage participation in or abnegation of religion. Mr. Justice Goldberg's concurring opinion in

*Abington* which I joined set forth these principles: "The fullest realization of true religious liberty requires that government neither engage in nor compel religious practices, that it effect no favoritism among sects or between religion and nonreligion, and that it work deterrence of no religious belief." 374 U. S., at 305. The Court's holding in *Torcaso* v. *Watkins,* 367 U. S. 488, 495 (1961), is to the same effect: the State cannot "constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can [it] aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." In the vast majority of cases the inquiry, albeit an elusive one, can end at this point. Neutrality and voluntarism stand as barriers against the most egregious and hence divisive kinds of state involvement in religious matters.

While these concepts are at the "core" of the Religion Clauses, they may not suffice by themselves to achieve in all cases the purposes of the First Amendment. As Professor Freund has only recently pointed out in Public Aid to Parochial Schools, 82 Harv. L. Rev. 1680 (1969), governmental involvement, while neutral, may be so direct or in such degree as to engender a risk of politicizing religion. Thus, as the opinion of THE CHIEF JUSTICE notes, religious groups inevitably represent certain points of view and not infrequently assert them in the political arena, as evidenced by the continuing debate respecting birth control and abortion laws. Yet history cautions that political fragmentation on sectarian lines must be guarded against. Although the very fact of neutrality may limit the intensity of involvement, government participation in certain programs, whose very nature is apt to entangle the state in details of administration and planning, may escalate to the point of inviting undue fragmentation. See my concurring

opinion in *Board of Education* v. *Allen,* 392 U. S. 236, 249 (1968), and the concurring opinion of Mr. Justice Goldberg in *Abington School Dist.* v. *Schempp, supra,* at 307.

## II

This legislation neither encourages nor discourages participation in religious life and thus satisfies the voluntarism requirement of the First Amendment. Unlike the instances of school prayers, *Abington School Dist.* v. *Schempp, supra,* and *Engel* v. *Vitale, supra,* or "released time" programs, *Zorach* v. *Clauson,* 343 U. S. 306 (1952), and *McCollum* v. *Board of Education,* 333 U. S. 203 (1948), the State is not "utilizing the prestige, power, and influence" of a public institution to bring religion into the lives of citizens. 374 U. S., at 307 (Goldberg, J., concurring).

The statute also satisfies the requirement of neutrality. Neutrality in its application requires an equal protection mode of analysis. The Court must survey meticulously the circumstances of governmental categories to eliminate, as it were, religious gerrymanders. In any particular case the critical question is whether the circumference of legislation encircles a class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter.

The statute that implements New York's constitutional provision for tax exemptions to religious organizations has defined a class of nontaxable entities whose common denominator is their nonprofit pursuit of activities devoted to cultural and moral improvement and the doing of "good works" by performing certain social services in the community that might otherwise have to be assumed by government. Included are such broad and divergent groups as historical and literary societies and more generally associations "for the moral or mental

improvement of men." The statute by its terms grants this exemption in furtherance of moral and intellectual diversity and would appear not to omit any organization that could be reasonably thought to contribute to that goal.

To the extent that religious institutions sponsor the secular activities that this legislation is designed to promote, it is consistent with neutrality to grant them an exemption just as other organizations devoting resources to these projects receive exemptions. I think, moreover, in the context of a statute so broad as the one before us, churches may properly receive an exemption even though they do not themselves sponsor the secular-type activities mentioned in the statute but exist merely for the convenience of their interested members. As long as the breadth of exemption includes groups that pursue cultural, moral, or spiritual improvement in multifarious secular ways, including, I would suppose, groups whose avowed tenets may be antitheological, atheistic, or agnostic, I can see no lack of neutrality in extending the benefit of the exemption to organized religious groups.[1]

---

[1] While I would suppose most churches devote part of their resources to secular community projects and conventional charitable activities, it is a question of fact, a fact that would only be relevant if we had before us a statute framed more narrowly to include only "charities" or a limited class of organizations, and churches. In such a case, depending on the administration of the exemption, it might be that the granting of an exemption to religion would turn out to be improper. This would depend, I believe, on what activities the church in fact sponsored. It would also depend, I think, on whether or to what extent the exemption were accorded to secular social organizations, conceived to benefit their own membership but also engaged in incidental general philanthropic or cultural undertakings. It might also depend on whether, if church-sponsored programs were not open to all without charge, the exemption were extended to private clubs and organizations promoting activities on

### III

Whether the present exemption entails that degree of involvement with government that presents a threat of fragmentation along religious lines involves, for me, a more subtle question than deciding simply whether neutrality has been violated. Unlike the subsidy that my Brother DOUGLAS foresees as the next step down the road, tax exemptions to nonprofit organizations are an institution in themselves, so much so that they are, as THE CHIEF JUSTICE points out, expected and accepted as a matter of course. See Freund, Public Aid to Parochial Schools, *supra.* In the instant case noninvolvement is further assured by the neutrality and breadth of the exemption. In the context of an exemption so sweeping as the one before us here its administration need not entangle government in difficult classifications of what is or is not religious, for any organization—although not religious in a customary sense—would qualify under the pervasive rubric of a group dedicated to the moral and cultural improvement of men. Obviously the more discriminating and complicated the basis of classification for an exemption—even

---

a contributory basis. These would all be questions of fact to be determined by the revenue authorities and the courts. While such determinations necessarily involve government in the religious institutions, they do not offend the First Amendment. That an evaluation of the scope of charitable activities in proportion to doctrinal pursuits may be difficult, does not render it undue interference with religion, cf. *Presbyterian Church* v. *Mary Eliz. Blue Hull Church,* 393 U. S. 440 (1969), for it does not entail judicial inquiry into dogma and belief. Indeed, such an inquiry may be inescapable in the context of a statute of less breadth than the one before us.

I would hold the present exemption neutral because New York has created a general class so broad that it would be difficult to conclude that religious organizations cannot properly be included in it.

a neutral one—the greater the potential for state involvement in evaluating the character of the organizations. Cf. *Presbyterian Church* v. *Mary Eliz. Blue Hull Church,* 393 U. S. 440 (1969).

I agree with my Brother DOUGLAS that exemptions do not differ from subsidies as an economic matter. Aside from the longstanding tradition behind exemptions there are other differences, however. Subsidies, unlike exemptions, must be passed on periodically and thus invite more political controversy than exemptions. Moreover, subsidies or direct aid, as a general rule, are granted on the basis of enumerated and more complicated qualifications and frequently involve the state in administration to a higher degree, though to be sure, this is not necessarily the case.

Whether direct aid or subsidies entail that degree of involvement that is prohibited by the Constitution is a question that must be reserved for a later case upon a record that fully develops all the pertinent considerations [2] such as the significance and character of subsidies in our political system and the role of the government in administering the subsidy in relation to the particular program aided. It may also be that the States, while bound to observe strict neutrality, should be freer to experiment with involvement—on a neutral basis—than the Federal Government. Cf., *e. g.,* my separate opinion in *Roth* v. *United States,* 354 U. S. 476, 496 (1957).

I recognize that for those who seek inflexible solutions this tripartite analysis provides little comfort. It is always possible to shrink from a first step lest the momentum will plunge the law into pitfalls that lie in the trail ahead. I, for one, however, do not believe

---

[2] The dimension of the problem would also require consideration of what kind of pluralistic society is compatible with the political concepts and traditions embodied in our Constitution.

that a "slippery slope" is necessarily without a constitutional toehold. Like THE CHIEF JUSTICE I am of the view that it is the task of this tribunal to "draw distinctions, including fine ones, in the process of interpreting the Constitution." *Ante,* at 679. The prospect of difficult questions of judgment in constitutional law should not be the basis for prohibiting legislative action that is constitutionally permissible. I think this one is, and on the foregoing premises join with the Court in upholding this New York statute.

MR. JUSTICE DOUGLAS, dissenting.

Petitioner is the owner of real property in New York and is a Christian. But he is not a member of any of the religious organizations, "rejecting them as hostile." The New York statute exempts from taxation real property "owned by a corporation or association organized exclusively for . . . religious . . . purposes" and used "exclusively for carrying out" such purposes.[1] Yet nonbelievers who own realty are taxed at the usual rate. The question in the case therefore is whether believers—organized in church groups—can be made exempt from real estate taxes, merely because they are believers, while nonbelievers, whether organized or not, must pay the real estate taxes.

My Brother HARLAN says he "would suppose" that the tax exemption extends to "groups whose avowed tenets may be antitheological, atheistic, or agnostic." *Ante,* at 697. If it does, then the line between believers and nonbelievers has not been drawn. But, with all respect, there is not even a suggestion in the present record that the statute covers property used exclusively by organizations for "antitheological purposes," "atheistic purposes," or "agnostic purposes."

In *Torcaso* v. *Watkins,* 367 U. S. 488, we held that

---

[1] N. Y. Real Prop. Tax Law § 420, subd. 1 (Supp. 1969–1970).

a State could not bar an atheist from public office in light of the freedom of belief and religion guaranteed by the First and Fourteenth Amendments. Neither the State nor the Federal Government, we said, "can constitutionally pass laws or impose requirements which aid all religions as against non-believers, and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." *Id.*, at 495.

That principle should govern this case.

There is a line between what a State may do in encouraging "religious" activities, *Zorach* v. *Clauson*, 343 U. S. 306, and what a State may not do by using its resources to promote "religious" activities, *McCollum* v. *Board of Education*, 333 U. S. 203, or bestowing benefits because of them. Yet that line may not always be clear. Closing public schools on Sunday is in the former category; subsidizing churches, in my view, is in the latter. Indeed I would suppose that in common understanding one of the best ways to "establish" one or more religions is to subsidize them, which a tax exemption does. The State may not do that any more than it may prefer "those who believe in no religion over those who do believe." *Zorach* v. *Clauson*, *supra*, at 314.

In affirming this judgment the Court largely overlooks the revolution initiated by the adoption of the Fourteenth Amendment. That revolution involved the imposition of new and far-reaching constitutional restraints on the States. Nationalization of many civil liberties has been the consequence of the Fourteenth Amendment, reversing the historic position that the foundations of those liberties rested largely in state law.

The process of the "selective incorporation" of various provisions of the Bill of Rights into the Fourteenth Amendment, although often provoking lively disagree-

ment at large as well as among the members of this Court, has been a steady one. It started in 1897 with *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, in which the Court held that the Fourteenth Amendment precluded a State from taking private property for public use without payment of just compensation, as provided in the Fifth Amendment. The first direct holding as to the incorporation of the First Amendment into the Fourteenth occurred in 1931 in *Stromberg* v. *California,* 283 U. S. 359, a case involving the right of free speech, although that holding in *Stromberg* had been foreshadowed in 1925 by the Court's opinion in *Gitlow* v. *New York,* 268 U. S. 652. As regards the religious guarantees of the First Amendment, the Free Exercise Clause was expressly deemed incorporated into the Fourteenth Amendment in 1940 in *Cantwell* v. *Connecticut,* 310 U. S. 296, although that holding had been foreshadowed in 1923 and 1934 by the Court's dicta in *Meyer* v. *Nebraska,* 262 U. S. 390, 399, and *Hamilton* v. *Regents,* 293 U. S. 245, 262. The Establishment Clause was not incorporated in the Fourteenth Amendment until *Everson* v. *Board of Education,* 330 U. S. 1, was decided in 1947.

Those developments in the last 30 years have had unsettling effects. It was, for example, not until 1962 that state-sponsored, sectarian prayers were held to violate the Establishment Clause. *Engel* v. *Vitale,* 370 U. S. 421. That decision brought many protests, for the habit of putting one sect's prayer in public schools had long been practiced. Yet if the Catholics, controlling one school board, could put their prayer into one group of public schools, the Mormons, Baptists, Moslems, Presbyterians, and others could do the same, once they got control. And so the seeds of Establishment would grow and a secular institution would be used to serve a sectarian end.

*Engel* was as disruptive of traditional state practices as was *Stromberg.* Prior to *Stromberg,* a State could arrest an unpopular person who made a rousing speech on the charge of disorderly conduct. Since *Stromberg,* that has been unconstitutional. And so the revolution occasioned by the Fourteenth Amendment has progressed as Article after Article in the Bill of Rights has been incorporated in it and made applicable to the States.

Hence the question in the present case makes irrelevant the "two centuries of uninterrupted freedom from taxation," referred to by the Court. *Ante,* at 678. If history be our guide, then tax exemption of church property in this country is indeed highly suspect, as it arose in the early days when the church was an agency of the state. See W. Torpey, Judicial Doctrines of Religious Rights in America 171 (1948). The question here, though, concerns the meaning of the Establishment Clause and the Free Exercise Clause made applicable to the States for only a few decades at best.

With all due respect the governing principle is not controlled by *Everson* v. *Board of Education, supra. Everson* involved the use of public funds to bus children to parochial as well as to public schools. Parochial schools teach religion; yet they are also educational institutions offering courses competitive with public schools. They prepare students for the professions and for activities in all walks of life. Education in the secular sense was combined with religious indoctrination at the parochial schools involved in *Everson.* Even so, the *Everson* decision was five to four and, though one of the five, I have since had grave doubts about it, because I have become convinced that grants to institutions teaching a sectarian creed violate the Establishment Clause. See *Engel* v. *Vitale, supra,* at 443–444 (DOUGLAS, J., concurring).

This case, however, is quite different. Education is not involved. The financial support rendered here is to the church, the place of worship. A tax exemption is a subsidy. Is my Brother BRENNAN correct in saying that we would hold that state or federal grants to churches, say, to construct the edifice itself would be unconstitutional? What is the difference between that kind of subsidy and the present subsidy? [2]

The problem takes us back where Madison was in 1784 and 1785 when he battled the Assessment Bill [3] in Virginia. That bill levied a tax for the support of Christian churches, leaving to each taxpayer the choice as to "what society of Christians" he wanted the tax paid; and absent such designation, the tax was to go for education. Even so, Madison was unrelenting in his opposition. As stated by Mr. Justice Rutledge:

"The modified Assessment Bill passed second reading in December, 1784, and was all but enacted.

---

[2] In the oral argument in *McCollum* v. *Board of Education,* 333 U. S. 203, the following colloquy took place between MR. JUSTICE BLACK and counsel John L. Franklin:

"MR. JUSTICE BLACK. Do I understand you to take the position that if the State of Illinois wanted to contribute five million dollars a year to religion they could do so, so long as they provided the same to every faith?

"MR. FRANKLIN. Yes, and the State of Illinois does contribute five million dollars annually to religious faiths, equally, and more than five million dollars, and has during its entire history.

"MR. JUSTICE BLACK. How does it do it?

"MR. FRANKLIN. By tax exemptions specifically granted to religious organizations.

"MR. JUSTICE BLACK. Your position is that they could grant five million dollars a year to religion, if they wanted to, out of the taxpayer's money, so long as they treated all faiths the same?

"MR. FRANKLIN. Yes, Your Honor. That is our interpretation of the meaning of the first clause of the First Amendment." J. O'Neill, Religion and Education under the Constitution 225 (1949).

[3] See Appendix I to this dissent, *post,* p. 716.

Madison and his followers, however, maneuvered deferment of final consideration until November, 1785. And before the Assembly reconvened in the fall he issued his historic Memorial and Remonstrance." *Everson* v. *Board of Education, supra,* at 37 (dissenting opinion).

The Remonstrance [4] stirred up such a storm of popular protest that the Assessment Bill was defeated.[5]

The Remonstrance covers some aspects of the present subsidy, including Madison's protest in paragraph 3 to a requirement that any person be compelled to contribute even "three pence" to support a church. All men, he maintained in paragraph 4, enter society "on equal conditions," including the right to free exercise of religion:

> "Whilst we assert for ourselves a freedom to embrace, to profess and to observe the Religion which we believe to be of divine origin, we cannot deny an equal freedom to those whose minds have not yet yielded to the evidence which has convinced us. If this freedom be abused, it is an offence against God, not against man: To God, therefore, not to men, must an account of it be rendered. As the Bill violates equality by subjecting some to peculiar burdens; so it violates the same principle, by granting to others peculiar exemptions."

Madison's assault on the Assessment Bill was in fact an assault based on both the concepts of "free exercise" and "establishment" of religion later embodied in the First Amendment. Madison, whom we recently called "the leading architect of the religion clauses of the First Amendment," *Flast* v. *Cohen,* 392 U. S. 83, 103,

---

[4] See Appendix II to this dissent, *post,* p. 719.

[5] See H. Eckenrode, Separation of Church and State in Virginia, c. V (1910).

was indeed their author and chief promoter.[6]  As Mr. Justice Rutledge said:

> "All the great instruments of the Virginia struggle for religious liberty thus became warp and woof of our constitutional tradition, not simply by the course of history, but by the common unifying force of Madison's life, thought and sponsorship.  He epitomized the whole of that tradition in the Amendment's compact, but nonetheless comprehensive, phrasing." *Everson* v. *Board of Education, supra,* at 39.

The Court seeks to avoid this historic argument as to the meaning of "establishment" and "free exercise" by relying on the long practice of the States in granting the subsidies challenged here.

Certainly government may not lay a tax on either worshiping or preaching.  In *Murdock* v. *Pennsylvania,* 319 U. S. 105, we ruled on a state license tax levied on religious colporteurs as a condition to pursuit of their activities.  In holding the tax unconstitutional we said:

> "The power to tax the exercise of a privilege is the power to control or suppress its enjoyment. *Magnano Co.* v. *Hamilton,* 292 U. S. 40, 44–45, and cases cited.  Those who can tax the exercise of this religious practice can make its exercise so costly as to deprive it of the resources necessary for its maintenance.  Those who can tax the privilege of engaging in this form of missionary evangelism can close its doors to all those who do not have a full purse.  Spreading religious beliefs in this ancient and honorable manner would thus be denied the needy.  Those who can deprive religious groups of their colporteurs can take from them a part of

---

[6] 1 Annals of Cong. 434, 729–731.

the vital power of the press which has survived from the Reformation." *Id.*, at 112.

Churches, like newspapers also enjoying First Amendment rights, have no constitutional immunity from all taxes. As we said in *Murdock:*

"We do not mean to say that religious groups and the press are free from all financial burdens of government. See *Grosjean* v. *American Press Co.*, 297 U. S. 233, 250. We have here something quite different, for example, from a tax on the income of one who engages in religious activities or a tax on property used or employed in connection with those activities. It is one thing to impose a tax on the income or property of a preacher. It is quite another thing to exact a tax from him for the privilege of delivering a sermon." *Ibid.*

State aid to places of worship, whether in the form of direct grants or tax exemption, takes us back to the Assessment Bill and the Remonstrance. The church *qua* church would not be entitled to that support from believers and from nonbelievers alike. Yet the church *qua* nonprofit, charitable institution is one of many that receive a form of subsidy through tax exemption. To be sure, the New York statute [7] does not single out the church for grant or favor. It includes churches in a long list of nonprofit organizations: for the moral or mental improvement of men and women (§ 420); for charitable, hospital, or educational purposes (*ibid.*); for playgrounds (*ibid.*); for scientific or literary objects (*ibid.*); for bar associations, medical societies, or libraries (*ibid.*); for patriotic and historical purposes (*ibid.*); for cemeteries (*ibid.*); for the enforcement of laws relating to children or animals (*ibid.*); for opera

[7] N. 1, *supra.*

houses (§ 426); for fraternal organizations (§ 428); for academies of music (§ 434); for veterans' organizations (§ 452); for pharmaceutical societies (§ 472); and for dental societies (§ 474). While the beneficiaries cover a wide range, "atheistic," "agnostic," or "antitheological" groups do not seem to be included.

Churches perform some functions that a State would constitutionally be empowered to perform. I refer to nonsectarian social welfare operations such as the care of orphaned children and the destitute and people who are sick. A tax exemption to agencies performing those functions would therefore be as constitutionally proper as the grant of direct subsidies to them. Under the First Amendment a State may not, however, provide worship if private groups fail to do so. As Mr. Justice Jackson said:

> "[A State] may socialize utilities and economic enterprises and make taxpayers' business out of what conventionally had been private business. It may make public business of individual welfare, health, education, entertainment or security. But it cannot make public business of religious worship or instruction, or of attendance at religious institutions of any character. . . . That is a difference which the Constitution sets up between religion and almost every other subject matter of legislation, a difference which goes to the very root of religious freedom and which the Court is overlooking today." *Everson* v. *Board of Education, supra,* at 26 (dissenting opinion).

That is a major difference between churches on the one hand and the rest of the nonprofit organizations on the other. Government could provide or finance operas, hospitals, historical societies, and all the rest because they represent social welfare programs within

the reach of the police power. In contrast, government may not provide or finance worship because of the Establishment Clause any more than it may single out "atheistic" or "agnostic" centers or groups and create or finance them.

The Brookings Institution, writing in 1933, before the application of the Establishment Clause of the First Amendment to the States, said about tax exemptions of religious groups: [8]

> "Tax exemption, no matter what its form, is essentially a government grant or subsidy. Such grants would seem to be justified only if the purpose for which they are made is one for which the legislative body *would be equally willing to make* a direct appropriation from public funds equal to the amount of the exemption. This test would not be met except in the case where the exemption is granted to encourage certain activities of private interests, which, if not thus performed, would have to be assumed by the government at an expenditure at least as great as the value of the exemption." (Emphasis added.)

Since 1947, when the Establishment Clause was made applicable to the States, that report would have to state that the exemption would be justified only where "the legislative body *could make*" an appropriation for the cause.

On the record of this case, the church *qua* nonprofit, charitable organization is intertwined with the church *qua* church. A church may use the same facilities, resources, and personnel in carrying out both its secular and its sectarian activities. The two are unitary and on the present record have not been separated one from

---

[8] The Brookings Institution, Report on a Survey of Administration in Iowa: The Revenue System 33 (1933).

the other. The state has a public policy of encouraging private public welfare organizations, which it desires to encourage through tax exemption. Why may it not do so and include churches *qua* welfare organizations on a nondiscriminatory basis? That avoids, it is argued, a discrimination against churches and in a real sense maintains neutrality toward religion which the First Amendment was designed to foster. Welfare services, whether performed by churches or by nonreligious groups, may well serve the public welfare.

Whether a particular church seeking an exemption for its welfare work could constitutionally pass muster would depend on the special facts. The assumption is that the church is a purely private institution, promoting a sectarian cause. The creed, teaching, and beliefs of one may be undesirable or even repulsive to others. Its sectarian faith sets it apart from all others and makes it difficult to equate its constituency with the general public. The extent that its facilities are open to all may only indicate the nature of its proselytism. Yet though a church covers up its religious symbols in welfare work, its welfare activities may merely be a phase of sectarian activity. I have said enough to indicate the nature of this tax exemption problem.

Direct financial aid to churches or tax exemptions to the church *qua* church is not, in my view, even arguably permitted. Sectarian causes are certainly not antipublic and many would rate their own church or perhaps all churches as the highest form of welfare. The difficulty is that sectarian causes must remain in the private domain not subject to public control or subsidy. That seems to me to be the requirement of the Establishment Clause. As Edmond Cahn said:

> "In America, Madison submitted most astutely, the rights of conscience must be kept not only free but *equal* as well. And in view of the endless varia-

tions—not only among the numerous sects, but also among the organized activities they pursued and the relative emotional values they attached to their activities—how could any species of government assistance be considered genuinely equal from sect to sect? If, for example, a state should attempt to subsidize all sectarian schools without discrimination, it would necessarily violate the principle of equality because certain sects felt impelled to conduct a large number of such schools, others few, others none.[9] How could the officers of government begin to measure the intangible factors that a true equality of treatment would involve, i. e., the relative intensity of religious attachment to parochial education that the respective groups required of their lay and clerical members? It would be presumptuous even to inquire. Thus, just as in matters of race our belated recognition of intangible factors has finally led us to the maxim 'separate therefore unequal,' so in matters of religion Madison's immediate recognition of intangible factors led us promptly to the maxim 'equal therefore separate.' Equality was out of the question without total separation." Confronting Injustice 186–187 (1967).

The exemptions provided here insofar as welfare projects are concerned may have the ring of neutrality. But subsidies either through direct grant or tax exemption for sectarian causes, whether carried on by church *qua* church or by church *qua* welfare agency, must be treated differently, lest we in time allow the church *qua* church to be on the public payroll, which, I fear, is imminent.

---

[9] This inequality, some argue, is pronounced when it comes to aid to parochial schools now run mainly by the Catholic Church. See G. Cogdell, What Price Parochiaid? 68–70 (1970).

As stated by my Brother BRENNAN in *Abington School Dist.* v. *Schempp,* 374 U. S. 203, 259 (concurring opinion), "It is not only the nonbeliever who fears the injection of sectarian doctrines and controversies into the civil polity, but in as high degree it is the devout believer who fears the secularization of a creed which becomes too deeply involved with and dependent upon the government."

Madison as President vetoed a bill incorporating the Protestant Episcopal Church in Alexandria, Virginia, as being a violation of the Establishment Clause. He said, *inter alia:* [10]

> "[T]he bill vests in the said incorporated church an authority to provide for the support of the poor and the education of poor children of the same, an authority which, being altogether superfluous if the provision is to be the result of pious charity, would be a precedent for giving to religious societies as such a legal agency in carrying into effect a public and civil duty."

He also vetoed a bill that reserved a parcel of federal land "for the use" of the Baptist Church, as violating the Establishment Clause.[11]

What Madison would have thought of the present state subsidy to churches—a tax exemption as distinguished from an outright grant—no one can say with certainty. The fact that Virginia early granted church tax exemptions cannot be credited to Madison. Certainly he seems to have been opposed. In his paper Monopolies, Perpetuities, Corporations, Ecclesiastical Endowments he wrote: [12] "Strongly guarded as is the separation between Religion & Govt in the Constitution of the United

---

[10] H. R. Misc. Doc. No. 210, pt. 1, 53d Cong., 2d Sess., 489–490.

[11] *Id.,* at 490.

[12] Fleet, Madison's "Detatched Memoranda," 3 Wm. & Mary Q. (3d ser.) 534, 551, 555 (1946).

States the danger of encroachment by Ecclesiastical Bodies, may be illustrated by precedents already furnished in their short history." And he referred, *inter alia*, to the "attempt in Kentucky for example, where it was proposed to exempt Houses of Worship from taxes." From these three statements, Madison, it seems, opposed all state subsidies to churches. Cf. D. Robertson, Should Churches Be Taxed? 60–61 (1968).

We should adhere to what we said in *Torcaso* v. *Watkins,* 367 U. S., at 495, that neither a State nor the Federal Government "can constitutionally pass laws or impose requirements *which aid all religions as against nonbelievers,* and neither can aid those religions based on a belief in the existence of God as against those religions founded on different beliefs." (Emphasis added.)

Unless we adhere to that principle, we do not give full support either to the Free Exercise Clause or to the Establishment Clause.

If a church can be exempted from paying real estate taxes, why may not it be made exempt from paying special assessments? The benefits in the two cases differ only in degree; and the burden on nonbelievers is likewise no different in kind.[13]

---

[13] See Zollmann, Tax Exemptions of American Church Property, 14 Mich. L. Rev. 646, 655–656 (1916).

The New York Supreme Court in *In re Mayor of New York*, 11 Johns. 77, 81, said:

"As the church property is not, nor is likely soon to be, either appropriated to renting or exposed to sale, but is devoted exclusively to religious purposes, the benefit resulting to it, by the improvement of *Nassau-street*, must be small in comparison with that of other property, and it, therefore, ought not to contribute in the like proportion. It may be considered, possibly, as benefited, by rendering the access to the churches more convenient, and the places more pleasant and salubrious, by the freer circulation of the air. This may have some influence on the pew rents, and the ground may become permanently more valuable. These, however, appear to be small and remote benefits to property so circumstanced; and to

The religiously used real estate of the churches today constitutes a vast domain. See M. Larson & C. Lowell, The Churches: Their Riches, Revenues, and Immunities (1969). Their assets total over $141 billion and their annual income at least $22 billion. *Id.*, at 232. And the extent to which they are feeding from the public trough in a variety of forms is alarming. *Id.*, c. 10.

We are advised that since 1968 at least five States have undertaken to give subsidies to parochial and other private schools [14]—Pennsylvania, Ohio, New York, Connecticut, and Rhode Island. And it is reported that under two federal Acts, the Elementary and Secondary Education Act of 1965, 79 Stat. 27, and the Higher Education Act of 1965, 79 Stat. 1219, *billions of dollars* have been granted to parochial and other private schools.

The federal grants to elementary and secondary schools under 79 Stat. 27 were made to the States which in turn made advances to elementary and secondary schools. Those figures are not available.

But the federal grants to private institutions of higher education are revealed in Department of Health, Education, and Welfare (HEW), Digest of Educational Statistics 16 (1969). These show in billions of dollars the following: [15]

| | |
|---|---|
| 1965–66 | $1.4 |
| 1966–67 | $1.6 |
| 1967–68 | $1.7 |
| 1968–69 | $1.9 |
| 1969–70 | $2.1 |

charge the churches equally with adjoining private property is unreasonable and extravagant; and on this point the report ought to be sent back to the commissioners for revisal and correction."

[14] U. S. News & World Report, May 4, 1970, p. 34.

[15] These totals include all types of federal aid—physical plants, dormitory construction, laboratories, libraries, lunch programs, fellowships and scholarships, etc.

Of the total federal outlays for education only two-fifths are for

It is an old, old problem.  Madison adverted to it: [16]

"Are there not already examples in the U. S. of ecclesiastical wealth equally beyond its object and the foresight of those who laid the foundation of it?  In the U. S. there is a double motive for fixing limits in this case, because wealth may increase not only from additional gifts, but from exorbitant advances in the value of the primitive one.  In grants of vacant lands, and of lands in the vicinity of growing towns & Cities the increase of value is often such as if foreseen, would essentially controul the liberality confirming them.  The people of the U. S. owe their Independence & their liberty, to the wisdom of descrying in the minute tax of 3 pence on tea, the magnitude of the evil comprized in the precedent.  Let them exert the same wisdom, in watching agst every evil lurking under plausible disguises, and growing up from small beginnings." [17]

programs administered by the Office of Education, other parts of the Department of HEW account for one-fifth.  The rest of the outlays are distributed among 24 federal departments and agencies, of which the largest shares are accounted for by the Department of Defense, the Veterans Administration, the National Science Foundation, and the Office of Economic Opportunity.  U. S. Bureau of the Budget, Special Analysis, Federal Education Program, 1971 Budget, Special Analysis I, pt. 2, p. 115 (Feb. 1970).

[16] Fleet, supra, n. 12, at 557–558.

[17] In 1875 President Grant in his State of the Union Message referred to the vast amounts of untaxed church property:

"In 1850, I believe, the church property of the United States which paid no tax, municipal or State, amounted to about $83,000,000.  In 1860 the amount had doubled; in 1875 it is about $1,000,000,000.  By 1900, without check, it is safe to say this property will reach a sum exceeding $3,000,000,000.  So vast a sum, receiving all the protection and benefits of Government without bearing its proportion of the burdens and expenses of the same, will not be looked upon acquiescently by those who have to pay the taxes.  In a growing country, where real estate enhances so rapidly with time, as in the United States, there is scarcely a limit

If believers are entitled to public financial support, so are nonbelievers. A believer and nonbeliever under the present law are treated differently because of the articles of their faith. Believers are doubtless comforted that the cause of religion is being fostered by this legislation. Yet one of the mandates of the First Amendment is to promote a viable, pluralistic society and to keep government neutral, not only between sects, but also between believers and nonbelievers. The present involvement of government in religion may seem *de minimis*. But it is, I fear, a long step down the Establishment path. Perhaps I have been misinformed. But as I have read the Constitution and its philosophy, I gathered that independence was the price of liberty.

I conclude that this tax exemption is unconstitutional.

### APPENDIX I TO OPINION OF DOUGLAS, J., DISSENTING

Assessment Bill. The December 24, 1784, print reproduced in the Supplemental Appendix to the dissenting opinion of Rutledge, J., in *Everson* v. *Board of Education*, 330 U. S. 1, 72:

### "A BILL ESTABLISHING A PROVISION FOR TEACHERS OF THE CHRISTIAN RELIGION.

"Whereas the general diffusion of Christian knowledge hath a natural tendency to correct the morals of men, restrain their vices, and preserve the peace of society;

---

to the wealth that may be acquired by corporations, religious or otherwise, if allowed to retain real estate without taxation. The contemplation of so vast a property as here alluded to, without taxation, may lead to sequestration, without constitutional authority and through blood.

"I would suggest the taxation of all property equally, whether church or corporation, exempting only the last resting place of the dead and possibly, with proper restrictions, church edifices." 9 Messages and Papers of the Presidents 4288–4289 (1897).

which cannot be effected without a competent provision for learned teachers, who may be thereby enabled to devote their time and attention to the duty of instructing such citizens, as from their circumstances and want of education, cannot otherwise attain such knowledge; and it is judged that such provision may be made by the Legislature, without counteracting the liberal principle heretofore adopted and intended to be preserved by abolishing all distinctions of pre-eminence amongst the different societies or communities of Christians;

"*Be it therefore enacted by the General Assembly,* That for the support of Christian teachers,     per centum on the amount, or     in the pound on the sum payable for tax on the property within this Commonwealth, is hereby assessed, and shall be paid by every person chargeable with the said tax at the time the same shall become due; and the Sheriffs of the several Counties shall have power to levy and collect the same in the same manner and under the like restrictions and limitations, as are or may be prescribed by the laws for raising the Revenues of this State.

"*And be it enacted,* That for every sum so paid, the Sheriff or Collector shall give a receipt, expressing therein to what society of Christians the person from whom he may receive the same shall direct the money to be paid, keeping a distinct account thereof in his books. The Sheriff of every County, shall, on or before the     day of     in every year, return to the Court, upon oath, two alphabetical lists of the payments to him made, distinguishing in columns opposite to the names of the persons who shall have paid the same, the society to which the money so paid was by them appropriated; and one column for the names where no appropriation shall be made. One of which lists, after being recorded in a book to be kept for that purpose, shall be filed by the Clerk in his office; the other shall by the Sheriff

be fixed up in the Court-house, there to remain for the inspection of all concerned. And the Sheriff, after deducting five per centum for the collection, shall forthwith pay to such person or persons as shall be appointed to receive the same by the Vestry, Elders, or Directors, however denominated of each such society, the sum so stated to be due to that society; or in default thereof, upon the motion of such person or persons to the next or any succeeding Court, execution shall be awarded for the same against the Sheriff and his security, his and their executors or administrators; provided that ten days previous notice be given of such motion. And upon every such execution, the Officer serving the same shall proceed to immediate sale of the estate taken, and shall not accept of security for payment at the end of three months, nor to have the goods forthcoming at the day of sale; for his better direction wherein, the Clerk shall endorse upon every such execution that no security of any kind shall be taken.

"*And be it further enacted,* That the money to be raised by virtue of this Act, shall be by the Vestries, Elders, or Directors of each religious society, appropriated to a provision for a Minister or Teacher of the Gospel of their denomination, or the providing places of divine worship, and to none other use whatsoever; except in the denominations of Quakers and Menonists, who may receive what is collected from their members, and place it in their general fund, to be disposed of in a manner which they shall think best calculated to promote their particular mode of worship.

"*And be it enacted,* That all sums which at the time of payment to the Sheriff or Collector may not be appropriated by the person paying the same, shall be accounted for with the Court in manner as by this Act is directed; and after deducting for his collection, the Sheriff shall pay the amount thereof (upon account cer-

tified by the Court to the Auditors of Public Accounts, and by them to the Treasurer) into the public Treasury, to be disposed of under the direction of the General Assembly, for the encouragement of seminaries of learning within the Counties whence such sums shall arise, and to no other use or purpose whatsoever.

"THIS Act shall commence, and be in force, from and after the       day of       in the year

"*A Copy from the Engrossed Bill.*

"JOHN BECKLEY, C. H. D."

## APPENDIX II TO OPINION OF DOUGLAS, J., DISSENTING [18]

Memorial and Remonstrance Against Religious Assessments, as reproduced in the Appendix to the dissenting opinion of Rutledge, J., in *Everson* v. *Board of Education,* 330 U. S. 1, 63 (2 The Writings of James Madison 183–191 (G. Hunt ed. 1901)):

"We, the subscribers, citizens of the said Commonwealth, having taken into serious consideration, a Bill printed by order of the last Session of General Assembly, entitled 'A Bill establishing a provision for Teachers of the Christian Religion,' and conceiving that the same, if finally armed with the sanctions of a law, will be a dangerous abuse of power, are bound as faithful members of a free State, to remonstrate against it, and to declare the reasons by which we are determined. We remonstrate against the said Bill,

"1. Because we hold it for a fundamental and undeniable truth, 'that Religion or the duty which we owe to our Creator and the Manner of discharging it, can be directed only by reason and conviction, not by force or violence.' The Religion then of every man must be left to the conviction and conscience of every

---

[18] Footnotes omitted.

man; and it is the right of every man to exercise it as these may dictate. This right is in its nature an unalienable right. It is unalienable; because the opinions of men, depending only on the evidence contemplated by their own minds, cannot follow the dictates of other men: It is unalienable also; because what is here a right towards men, is a duty towards the Creator. It is the duty of every man to render to the Creator such homage, and such only, as he believes to be acceptable to him. This duty is precedent both in order of time and degree of obligation, to the claims of Civil Society. Before any man can be considered as a member of Civil Society, he must be considered as a subject of the Governor of the Universe: And if a member of Civil Society, who enters into any subordinate Association, must always do it with a reservation of his duty to the general authority; much more must every man who becomes a member of any particular Civil Society, do it with a saving of his allegiance to the Universal Sovereign. We maintain therefore that in matters of Religion, no man's right is abridged by the institution of Civil Society, and that Religion is wholly exempt from its cognizance. True it is, that no other rule exists, by which any question which may divide a Society, can be ultimately determined, but the will of the majority; but it is also true, that the majority may trespass on the rights of the minority.

"2. Because if religion be exempt from the authority of the Society at large, still less can it be subject to that of the Legislative Body. The latter are but the creatures and vicegerents of the former. Their jurisdiction is both derivative and limited: it is limited with regard to the co-ordinate departments, more necessarily is it limited with regard to the constituents. The preservation of a free government requires not merely, that the metes and bounds which separate each department

of power may be invariably maintained; but more espe-
cially, that neither of them be suffered to overleap the
great Barrier which defends the rights of the people.
The Rulers who are guilty of such an encroachment,
exceed the commission from which they derive their
authority, and are Tyrants. The People who submit
to it are governed by laws made neither by themselves,
nor by an authority derived from them, and are slaves.

"3. Because, it is proper to take alarm at the first
experiment on our liberties. We hold this prudent jeal-
ousy to be the first duty of citizens, and one of [the]
noblest characteristics of the late Revolution. The free-
men of America did not wait till usurped power had
strengthened itself by exercise, and entangled the ques-
tion in precedents. They saw all the consequences in
the principle, and they avoided the consequences by
denying the principle. We revere this lesson too much,
soon to forget it. Who does not see that the same
authority which can establish Christianity, in exclusion
of all other Religions, may establish with the same ease
any particular sect of Christians, in exclusion of all other
Sects? That the same authority which can force a citi-
zen to contribute three pence only of his property for
the support of any one establishment, may force him
to conform to any other establishment in all cases
whatsoever?

"4. Because, the bill violates that equality which
ought to be the basis of every law, and which is more
indispensible, in proportion as the validity or expediency
of any law is more liable to be impeached. If 'all men
are by nature equally free and independent,' all men are
to be considered as entering into Society on equal condi-
tions; as relinquishing no more, and therefore retaining
no less, one than another, of their natural rights. Above
all are they to be considered as retaining an 'equal title
to the free exercise of Religion according to the dictates

of conscience.' Whilst we assert for ourselves a freedom to embrace, to profess and to observe the Religion which we believe to be of divine origin, we cannot deny an equal freedom to those whose minds have not yet yielded to the evidence which has convinced us. If this freedom be abused, it is an offence against God, not against man: To God, therefore, not to men, must an account of it be rendered. As the Bill violates equality by subjecting some to peculiar burdens; so it violates the same principle, by granting to others peculiar exemptions. Are the Quakers and Menonists the only sects who think a compulsive support of their religions unnecessary and unwarantable? Can their piety alone be intrusted with the care of public worship? Ought their Religions to be endowed above all others, with extraordinary privileges, by which proselytes may be enticed from all others? We think too favorably of the justice and good sense of these denominations, to believe that they either covet pre-eminencies over their fellow citizens, or that they will be seduced by them, from the common opposition to the measure.

"5. Because the bill implies either that the Civil Magistrate is a competent Judge of Religious truth; or that he may employ Religion as an engine of Civil policy. The first is an arrogant pretension falsified by the contradictory opinions of Rulers in all ages, and throughout the world: The second an unhallowed perversion of the means of salvation.

"6. Because the establishment proposed by the Bill is not requisite for the support of the Christian Religion. To say that it is, is a contradiction to the Christian Religion itself; for every page of it disavows a dependence on the powers of this world: it is a contradiction to fact; for it is known that this Religion both existed and flourished, not only without the support of human laws, but in spite of every opposition from them; and not only

during the period of miraculous aid, but long after it had been left to its own evidence, and the ordinary care of Providence: Nay, it is a contradiction in terms; for a Religion not invented by human policy, must have pre-existed and been supported, before it was established by human policy. It is moreover to weaken in those who profess this Religion a pious confidence in its innate excellence, and the patronage of its Author; and to foster in those who still reject it, a suspicion that its friends are too conscious of its fallacies, to trust it to its own merits.

"7. Because experience witnesseth that ecclesiastical establishments, instead of maintaining the purity and efficacy of Religion, have had a contrary operation. During almost fifteen centuries, has the legal establishment of Christianity been on trial. What have been its fruits? More or less in all places, pride and indolence in the Clergy; ignorance and servility in the laity; in both, superstition, bigotry and persecution. Enquire of the Teachers of Christianity for the ages in which it appeared in its greatest lustre; those of every sect, point to the ages prior to its incorporation with Civil policy. Propose a restoration of this primitive state in which its Teachers depended on the voluntary rewards of their flocks; many of them predict its downfall. On which side ought their testimony to have greatest weight, when for or when against their interest?

"8. Because the establishment in question is not necessary for the support of Civil Government. If it be urged as necessary for the support of Civil Government only as it is a means of supporting Religion, and it be not necessary for the latter purpose, it cannot be necessary for the former. If Religion be not within [the] cognizance of Civil Government, how can its legal establishment be said to be necessary to civil Government? What influence in fact have ecclesiastical establishments

had on Civil Society? In some instances they have
been seen to erect a spiritual tyranny on the ruins of
Civil authority; in many instances they have been seen
upholding the thrones of political tyranny; in no instance
have they been seen the guardians of the liberties of the
people. Rulers who wished to subvert the public liberty,
may have found an established clergy convenient auxil-
iaries. A just government, instituted to secure & per-
petuate it, needs them not. Such a government will be
best supported by protecting every citizen in the enjoy-
ment of his Religion with the same equal hand which
protects his person and his property; by neither invad-
ing the equal rights of any Sect, nor suffering any Sect
to invade those of another.

"9. Because the proposed establishment is a departure
from that generous policy, which, offering an asylum to
the persecuted and oppressed of every Nation and Reli-
gion, promised a lustre to our country, and an accession
to the number of its citizens. What a melancholy mark
is the Bill of sudden degeneracy? Instead of holding
forth an asylum to the persecuted, it is itself a signal
of persecution. It degrades from the equal rank of
Citizens all those whose opinions in Religion do not
bend to those of the Legislative authority. Distant as
it may be, in its present form, from the Inquisition it
differs from it only in degree. The one is the first step,
the other the last in the career of intolerance. The
magnanimous sufferer under this cruel scourge in for-
eign Regions, must view the Bill as a Beacon on our
Coast, warning him to seek some other haven, where
liberty and philanthropy in their due extent may offer
a more certain repose from his troubles.

"10. Because, it will have a like tendency to banish
our Citizens. The allurements presented by other sit-
uations are every day thinning their number. To super-
add a fresh motive to emigration, by revoking the liberty

which they now enjoy, would be the same species of folly which has dishonoured and depopulated flourishing kingdoms.

"11. Because, it will destroy that moderation and harmony which the forbearance of our laws to intermeddle with Religion, has produced amongst its several sects. Torrents of blood have been spilt in the old world, by vain attempts of the secular arm to extinguish Religious discord, by proscribing all difference in Religious opinions. Time has at length revealed the true remedy. Every relaxation of narrow and rigorous policy, wherever it has been tried, has been found to assuage the disease. The American Theatre has exhibited proofs, that equal and compleat liberty, if it does not wholly eradicate it, sufficiently destroys its malignant influence on the health and prosperity of the State. If with the salutary effects of this system under our own eyes, we begin to contract the bonds of Religious freedom, we know no name that will too severely reproach our folly. At least let warning be taken at the first fruits of the threatened innovation. The very appearance of the Bill has transformed that 'Christian forbearance, love and charity,' which of late mutually prevailed, into animosities and jealousies, which may not soon be appeased. What mischiefs may not be dreaded should this enemy to the public quiet be armed with the force of a law?

"12. Because, the policy of the bill is adverse to the diffusion of the light of Christianity. The first wish of those who enjoy this precious gift, ought to be that it may be imparted to the whole race of mankind. Compare the number of those who have as yet received it with the number still remaining under the dominion of false Religions; and how small is the former! Does the policy of the Bill tend to lessen the disproportion? No; it at once discourages those who are strangers to the light of [revelation] from coming into the Region

of it; and countenances, by example the nations who continue in darkness, in shutting out those who might convey it to them. Instead of levelling as far as possible, every obstacle to the victorious progress of truth, the Bill with an ignoble and unchristian timidity would circumscribe it, with a wall of defence, against the encroachments of error.

"13. Because attempts to enforce by legal sanctions, acts obnoxious to so great a proportion of Citizens, tend to enervate the laws in general, and to slacken the bands of Society. If it be difficult to execute any law which is not generally deemed necessary or salutary, what must be the case where it is deemed invalid and dangerous? and what may be the effect of so striking an example of impotency in the Government, on its general authority.

"14. Because a measure of such singular magnitude and delicacy ought not to be imposed, without the clearest evidence that it is called for by a majority of citizens: and no satisfactory method is yet proposed by which the voice of the majority in this case may be determined, or its influence secured. 'The people of the respective counties are indeed requested to signify their opinion respecting the adoption of the Bill to the next Session of Assembly.' But the representation must be made equal, before the voice either of the Representatives or of the Counties, will be that of the people. Our hope is that neither of the former will, after due consideration, espouse the dangerous principle of the Bill. Should the event disappoint us, it will still leave us in full confidence, that a fair appeal to the latter will reverse the sentence against our liberties.

"15. Because, finally, 'the equal right of every citizen to the free exercise of his Religion according to the dictates of conscience' is held by the same tenure with all our other rights. If we recur to its origin, it is equally the gift of nature; if we weigh its importance, it cannot

be less dear to us; if we consult the Declaration of those rights which pertain to the good people of Virginia, as the 'basis and foundation of Government,' it is enumerated with equal solemnity, or rather studied emphasis. Either then, we must say, that the will of the Legislature is the only measure of their authority; and that in the plenitude of this authority, they may sweep away all our fundamental rights; or, that they are bound to leave this particular right untouched and sacred: Either we must say, that they may controul the freedom of the press, may abolish the trial by jury, may swallow up the Executive and Judiciary Powers of the State; nay that they may despoil us of our very right to suffrage, and erect themselves into an independent and hereditary assembly: or we must say, that they have no authority to enact into law the Bill under consideration. We the subscribers say, that the General Assembly of this Commonwealth have no such authority: And that no effort may be omitted on our part against so dangerous an usurpation, we oppose to it, this remonstrance; earnestly praying, as we are in duty bound, that the Supreme Lawgiver of the Universe, by illuminating those to whom it is addressed, may on the one hand, turn their councils from every act which would affront his holy prerogative, or violate the trust committed to them: and on the other, guide them into every measure which may be worthy of his [blessing, may re]dound to their own praise, and may establish more firmly the liberties, the prosperity, and the Happiness of the Commonwealth."