Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued September 18, 2003        Decided May 11, 2004

No. 00-1310

AMERICAN FAMILY ASSOCIATION, INC.
PETITIONER

v.

FEDERAL COMMUNICATIONS COMMISSION AND
UNITED STATES OF AMERICA,
RESPONDENTS

NATIONAL PUBLIC RADIO, INC. AND
ASSOCIATION OF PUBLIC TELEVISION STATIONS,
INTERVENORS

Consolidated with
00-1479, 01-1222

On Petitions for Review of Orders of the
Federal Communications Commission

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

*Stephen M. Crampton* argued the cause for petitioners American Family Association, Inc. and Community Television, Inc. With him on the briefs were *Patrick J. Vaughn, Brian Fahling, Michael J. DePrimo,* and *Gene A. Bechtel.*

*Ernest T. Sanchez* argued the cause for petitioner State of Oregon. With him on the briefs was *Susan M. Jenkins.*

*C. Grey Pash, Jr.*, Counsel, Federal Communications Commission, argued the cause for respondents. With him on the brief were *R. Hewitt Pate,* Acting Assistant Attorney General, U.S. Department of Justice, *Robert B. Nicholson* and *Robert J. Wiggers*, Attorneys, *John A. Rogovin*, General Counsel, Federal Communications Commission, and *Daniel M. Armstrong*, Associate General Counsel.

*Lonna M. Thompson, Neal A. Jackson, Gregory A. Lewis*, and *Michelle M. Shanahan* were on the brief for intervenors. *Marilyn Mohrman–Gillis* entered an appearance.

*Angela J. Campbell* and *Jeffrey M. Karp* were on the brief for *amicus curiae* Office of Communication of the United Church of Christ, Inc. in support of respondents.

Before: SENTELLE, HENDERSON and TATEL, *Circuit Judges.*

Opinion for the Court filed by *Circuit Judge* SENTELLE.

SENTELLE, *Circuit Judge*: These consolidated petitions for review challenge the Federal Communication Commission's ("FCC") new system for allocating noncommercial educational ("NCE") broadcast licenses among competing applicants. This system allocates the licenses primarily by awarding "points" to each applicant based on several criteria; the applicant with the highest number of points presumptively is awarded the license. The FCC promulgated the system by order after a notice-and-comment proceeding, *In re Reexamination of the Comparative Standards for Noncommercial Educational Applicants*, 15 FCC Rcd 7386 (2000), *vacated in part, Nat'l Pub. Radio, Inc. v. FCC*, 254 F.3d 226 (D.C. Cir. 2001) ("*Order*"), and affirmed the rule on rehearing, *In re Reexamination of the Comparative Standards for Noncom-*

*mercial Educational Applicants*, 16 FCC Rcd 5074 (2001) ("*Reh'g Order*").

Petitioner American Family Association, Inc., ("AFA") a national Christian ministry that owns and operates 113 NCE stations, claims that the new criteria for allocating such licenses systematically discriminate against religious national broadcasting networks and are thereby unconstitutional. AFA also says that the FCC irrationally justified the point system, making it arbitrary and capricious. Petitioner Community Television, Inc., an NCE licensee based in Atlanta, Georgia, produces secular and religious programming and joins AFA's claims. Separately, the state of Oregon asserts that, for different reasons, the criteria are irrational and exceed the FCC's authority under the Telecommunications Act. We reject all of petitioners' contentions and deny the petitions.

## I.   Background

### A.   The Point System

Petitioners' claims concern the process the FCC has adopted for the allocation of NCE broadcast licenses. NCE licenses confer on license holders the exclusive right to broadcast on television and FM radio frequencies that the FCC has set aside exclusively for noncommercial educational use. About twenty percent of total channels and frequencies have been so reserved.

The new system at issue in this case arose from the FCC's decision, in the late 1990s, to change the way it allocates these licenses. The old system allocated them via individualized FCC hearings that selected among competitors based on what was, in the FCC's words, a "vague standard [that] may [have made] rational choices among noncommercial applicants difficult, if not impossible." *Reexamination of the Policy Statement on Comparative Broadcast Hearings*, 7 FCC Rcd 2664, 2669 (1992). In 1998, the FCC gave notice of and invited comment on a proposal to implement a new system that would allocate NCE licenses based on more objective criteria. *See In re Reexamination of the Comparative Stan-*

*dards for Noncommercial Educational Applicants*, 13 FCC Rcd 21167 (1998).

After receiving comments, the FCC eventually adopted a new point system for allocating NCE licenses. As between qualified applicants who seek the same license, the system presumptively awards the license to the applicant with the greatest number of "points" (subject to some complications not relevant here). 47 C.F.R. § 73.7003(a) (2003). If applicants have the same number of points, the applicant with the fewest existing licenses gets the license. *Id.* § 73.7003(c)(1). If applicants have the same number of points and the same number of existing licenses, the applicant with the fewest outstanding license applications wins. *Id.* § 73.7003(c)(2). To screen out fraudulent claims in applications, the FCC stated that its staff will conduct random audits of applications. *Order* ¶ 89. Also, the FCC will conduct "acceptability studies" for each applicant who has the most points. *Id.* ¶ 90. If an application is deemed unacceptable after investigation, the FCC will return it. Finally, winning applicants must maintain the characteristics for which they received points for at least four years of the eight-year license term. 47 C.F.R. § 73.7005(a). During that period, any entity that buys the station must demonstrate eligibility for the same number of points as the selling applicant had. *Id.*

The system awards points as follows:

- two points for "local diversity of ownership";

- one to two points for the "best technical proposal";

- three points for "established local entities"; and

- two points for status as a "state-wide educational network," but only for a network that does not qualify for diversity-of-ownership points.

*Id.* § 73.7003.

For any given license, the local diversity-of-ownership criterion favors applicants who do not own or control other stations near the area the license holder will serve. Specifically, an applicant gets two points for diversity of ownership

if the applicant has no "attributable" interests in stations with overlapping "principal community contours" (defined as areas covered by a certain broadcast signal strength) and if the applicant's governing documents require that diversity to be maintained. *Id.* § 73.7003(b)(2). The FCC stated that it adopted this criterion to foster broadcast diversity by allowing the local public to be served by different NCE licensees. *E.g., Order* ¶ 29.

An applicant has attributable interests in the licenses it owns and the licenses its owners own. "Ownership interests" are defined in the notes to 47 C.F.R. § 73.3555, the commercial ownership attribution rules. 47 C.F.R. §§ 73.3555(f), 73.7000. For example, a licensee gets no points for diversity if its broadcasting range (appropriately defined) overlaps with another licensee who is owned by the same person or corporation. Also attributable to the applicant is an interest of an entity that both provides a third of the applicant's equity or debt and either provides more than 15 percent of the applicant's weekly programming or has an ownership interest (again as defined by section 73.3555) in the same media market. *Id.* § 73.7000. If an existing licensee, for instance, financed construction of a new station for an applicant, on condition that the applicant air a majority of the existing licensee's programming, the existing licensee's interest would be attributed to the applicant. *See Order* ¶ 79.

Like the diversity criterion, the "established local entities" factor also advantages applicants the FCC deemed would advance the cause of "localism" – the goal of having licenses controlled by people in diverse communities and who are familiar with the community the license covers. Under that factor, entities that have been "local" continuously for two years are considered "established local entities," which entitles them to three points. 47 C.F.R. § 73.7003(b)(1). "Local," in turn, means that the applicant is physically headquartered, has a campus, or has 75% of its board members residing within 25 miles of the community the broadcast license will serve. *Id.* § 73.7000. Government entities are considered "local" wherever those entities' authority extends. *Id.*

The state-wide educational network credit awards two points to certain schools and universities. Educational entities that do not qualify for diversity of ownership points will be awarded two points if they both have authority over at least 50 elementary or secondary schools and provide programming to the schools in furtherance of the schools' curriculum. *Id.* § 73.7003(b)(3). Higher education institutions qualify if they serve at least five full-time campuses and provide programming in furtherance of those campuses' curriculum. *Id.*

The FCC created the state-wide educational network credit to compensate for the inability of large educational networks to qualify for the diversity credit. *See Order* ¶ ¶ 58-60. That inability arises because large educational networks (for example, state universities) control stations that serve many schools and campuses within a single state. The signals of those stations generally overlap with the areas served by other in-state broadcast licenses. The overlap disqualifies the networks who control these stations from receiving two points for diversity of ownership. This inability, the FCC reasoned, merited awarding such networks two additional points, even though they are, according to the criteria, "nondiverse" for licenses within the existing reach of their networks. *Id.* ¶ 60.

Finally, the system awards points to technically superior applicants. An applicant receives one additional point if its station will cover 10% more area and population than the next technically best applicant's station. 47 C.F.R. § 73.7003(b)(4). An applicant receives two points if its station will cover 25% or more area and population than the next technically best applicant's station. *Id.*

B.   The Structure of AFA, NPR, and PBS

National Public Radio ("NPR") is a nonprofit corporation that produces and distributes news to member radio stations. It also licenses news to nonmember stations, many of which are state colleges and universities. Many NPR member stations also are funded by the Corporation for Public Broadcasting, a federally created corporation. The public fisc, however, is not their only source of money. They also receive

individual membership dues and federal and local grants. The Public Broadcasting Service ("PBS") functions similarly. It distributes programming to member stations from individual stations that produce the programming (rather than centrally producing the programming itself).

Many public NCE stations are affiliated with NPR and PBS and derive much of their programming from NPR, PBS, and other national sources. For example, the vast majority of public radio stations' weekly news broadcasts, at least as of a few years ago, came from national sources, like NPR, and Public Radio International. NPR-affiliated radio stations broadcast local programming as well. Music programs comprise most of that local content. As for public television, PBS centrally distributes most prime-time public programming, but public television stations also broadcast local programs.

Despite their influence over public television and radio, PBS and NPR themselves hold no broadcast licenses. Licenses are held instead by the individual affiliates. However, the affiliates do exercise some degree of control over NPR's and PBS's operations. NPR and PBS members, for example, elect managers of affiliated stations to serve on NPR's and PBS's board of directors.

Other national networks, like the one run by AFA, are more centralized than PBS and NPR. AFA is a national media network that produces and distributes news from a Christian perspective. Unlike public broadcasting affiliates, AFA and other large national chains own the stations to which they distribute news. AFA also holds the licenses that authorize its stations to broadcast NCE programming. Eight of the largest such centralized national chains, like AFA, are devoted primarily to religious programming.

AFA's centralized structure comparatively disadvantages it under the point system as against NPR's and PBS's decentralized structures. NPR and PBS have no ownership, equity, or lending interests in individual NCE public licensees. They therefore have no "attributable" interest in those stations under the FCC's attribution rules. Religious networks, including AFA, that own their member stations and centrally hold the licenses have attributable ownership interests in the

stations they own and in the licenses they hold. For example, if two NPR affiliates that regularly broadcast national NPR programming applied for licenses with overlapping signals, each individual station still would potentially be eligible for the diversity credit for each license. The same would not be true of two overlapping AFA affiliates: AFA's ownership interest in each would be attributed to each affiliate, making the applicants nondiverse and disqualifying them from diversity credit. Similarly, because AFA centrally owns and controls its members, AFA affiliates will not likely qualify for the "established local entities" credit. NPR and PBS affiliates, in contrast, are mostly locally controlled, and are thus more likely to receive points for being established local entities.

Even some public affiliates who are nondiverse will qualify for two additional points under the state-wide educational network credit. Because of their size and educational focuses, the most likely candidates for this credit are state public schools and universities. These institutions already hold many overlapping NCE licenses. Yet institutions that qualify for this credit may receive two additional points even for licenses within their current broadcast reach. Private educational organizations, in contrast, are not as large, and so will not get the credit without dramatically expanding, and only if they do so in one state.

## II. Analysis

Petitioners raise both statutory and constitutional challenges to the FCC's rule. We will first deal with the statutory challenges, and because we reject those, next consider the constitutional challenges.

### A. Statutory Challenges

Both AFA and Oregon submit that the final rule is arbitrary and capricious. Oregon also claims that the final rule is inconsistent with 47 U.S.C. § 398. Both arguments lack merit.

#### 1. Rationality of the Locality Credit

We reject AFA's claim that the FCC's justification for adopting the three-point credit for established local entities is

arbitrary and capricious under the standard set forth in *Motor Vehicle Manufacturers Association v. State Farm Mutual Life Insurance Co.*, 463 U.S. 29, 41-44 (1983). AFA argues that the localism credit is irrational because, as AFA correctly points out, the FCC justified it by analogizing to its instructional television rules, which allocate points to applicants who produce instructional television and FM radio programming, and which also heavily favor local applicants. The analogy between the two, AFA claims, is false: instructional television, for example, is used in school classrooms, whereas NCE broadcasting serves the community at large.

We hold that the FCC's analogy to the instructional television rules is not irrational. The FCC explained that there is a strong tradition of local control in NCE broadcasting, and that local entities best understand the educational needs of, and are accountable to, their communities. *Order* ¶ ¶ 42-48. The FCC reasoned that "local entities best understand the educational needs and academic standards of their communities[,] and are the best authorities for selecting programming to meet those needs." *Id.* ¶ 46.

NCE broadcasting is analogous to instructional television in that both are educational. It is true, as AFA points out, that NCE broadcasting does not focus solely on *instructional* educational programming, as do the instructional television rules. But it remains true that NCE applicants' broadcast frequencies, as a threshold matter, all must "be used for the advancement of an educational program," 47 C.F.R. 73.503, and so, by definition, are also educational. There is a rational connection between local accountability and education, since it is reasonable to expect that locals are in the best position to judge their own educational needs. That rational connection, together with local entities' strong traditional role in NCE broadcasting, makes the agency's explanation rational.

Oregon mounts three distinct, and equally unpersuasive, challenges to the rationality of the locality credit. As noted above, the locality credit awards three points to "local" applicants. The rule defines a "local" applicant as one physically

headquartered in, having a campus in, or having 75% of its board members residing within 25 miles of the center of the community the broadcast license will serve. 47 C.F.R. § 73.7000. Government entities are considered "local" wherever their authority extends. *Id.*

Oregon first faults the FCC for failing to award points for local origination of programming, in addition (or perhaps in lieu of) to the points for local control over programming. We find the FCC's reason for rejecting Oregon's proposal to be rational. The FCC explained that local broadcasters should have the flexibility to broadcast programming regardless of its source, given that NCE stations have a wide audience. *Order* ¶ ¶ 65-66. That explanation is quite rational. There is no reason to suppose that the supply of NCE programming is coextensive with demand for it in any given local community. In truth, the opposite assumption is plausible: local supply may well be inadequate to meet local demand, given that there are likely, on average, more listeners in any given community than there are content producers. In any event, even if local origination of programming served the needs of local communities well, fostering local control advances that goal also. Given that both options are rational, the FCC's choice of means is well within its discretion.

We also reject Oregon's other reasons for thinking the locality credit arbitrary. Oregon argues that mere local presence, the factor the locality credit rewards, will not ensure that programming will be locally produced. This argument misses the point. As explained above, the FCC designed its locality credit not to encourage locally produced programming, but rather to reward local control over programming wherever the programming is produced. *Id.* ¶ 66; *Reh'g Order* ¶ 74. The practice of rewarding applicants who are controlled by locals is rationally related to that goal.

Oregon also claims that the FCC's definition of "local" is irrational. Again we disagree. Oregon argues that the 25-mile radius is arbitrary because that criterion does not account for the different geographies of local communities nationwide. But the FCC offered two rational justifications

for not individualizing its definition of local. First, the FCC reasoned that doing so would be difficult for applicants to administer. *Reh'g Order* ¶ 50. Second, the FCC justified the radius by analogy to that same definition of local in the instructional television rules. *Order* ¶ 54. For the reasons stated above, the analogy between this rulemaking proceeding and the instructional television rules is rational. We find nothing arbitrary in this chain of reasoning.

Lastly, Oregon attacks the rationality of defining governments to be local wherever their authority extends. It argues that it is irrational to so limit the definition of local, given that the signals of educational broadcasting travel across jurisdictional lines. We once again find no cognizable defect in the FCC's reasoning. The FCC reasoned that local governments are especially accountable to people within their jurisdictions and so will be especially responsive to their needs. *Reh'g Order* ¶ 50. This explanation meshes quite well with the FCC's overarching premise that encouraging local control will ensure local accountability over educational broadcasting; indeed, politicians are probably *more* accountable to voters in their districts than local broadcasters are to their neighbors. It is true that, unlike the 25-mile radius, this aspect of the definition of local is individualized, and so will be administratively costly. But the FCC addressed this worry as well. It pointed to "recognizable extrinsic factors, such as where a person pays taxes and what school district he lives in," that will ease the administrative difficulties of making this aspect of the definition of local dependent on individualized factors. *Id.* We hold that these justifications are legally adequate.

2. Rationality of the State-wide Educational Credit

AFA also assails the FCC's justification for adopting the state-wide educational network credit. That credit, again, awards two points to certain very large schools and universities that do not qualify for diversity-of-ownership credit but operate in a single state. AFA's argument is that this credit does not advance the cause of broadcast diversity. AFA points out that as a practical matter, the only beneficiaries of

the credit will be large state universities, many of which already hold many NCE licenses and offer "a uniform viewpoint[ ] determined (in most cases) by a distant bureaucracy." AFA Br. at 38. That two-point advantage, the argument goes, negates the edge a truly diverse entity, one who qualifies for the two-point diversity credit, would otherwise have. The state-wide network credit therefore undermines the FCC's stated goal of advancing broadcast diversity, AFA submits.

We do not think AFA's argument carries its high burden of demonstrating that the FCC's justification for the state-wide network credit is on its face arbitrary and capricious. First, the FCC reasoned that large schools are especially attractive candidates for NCE broadcast licenses, as they "ensure[ ] that educational programming is available throughout a specific area in a coordinated and organized manner most appropriate to that area, and especially to schools." Therefore, these institutions carry "distinct benefits" even if they do not qualify for the diversity-of-ownership credit. *Order* ¶ ¶ 56, 58. Second, only large schools should be eligible for the credit, the FCC reasoned, because smaller schools, including private entities, will more easily be eligible for the diversity credit and will not need an extra boost. *Id.* ¶ 60. Third, single-state networks provide more focused educational benefits than do "national and regional" networks, since national and regional networks cannot "set the educational policies of schools or have schools accountable to them." *Id.*

We cannot say that this explanation is arbitrary and capricious on the record before us. As explained above, there is a rational link between NCE broadcasting and educational programming. It is reasonable to assume that educational institutions are in an especially good position to provide educational programming, whether or not that programming is "diverse." It follows that there is a rational basis in providing educational institutions with extra points even if they do not qualify for diversity credit. There is no question that state-wide network credit does that.

The more difficult issue is whether limiting that educational benefit only to educational organizations of a certain size and in a single state – in particular, organizations with a minimum of 50 secondary and elementary schools in a single state or at least five campuses in a single state – is rational. The FCC's explanation for this aspect of the credit, again, relies on two premises: first, its prediction that smaller educational organizations will easily qualify for the diversity credit; and second, the empirical assumption that multi-state and regional networks "are generally satellite operations of distant stations, without the ability to set educational policies for schools or have schools accountable to them," and therefore as educational providers are inferior to large single-state networks. *Order* ¶ 60.

These assumptions appear rational on the current record. We have no obvious way of verifying the FCC's assertion regarding the general characteristics of multi-state and regional networks. Neither party has directed us to empirical information in the record either verifying or contradicting this assumption. We must defer to the Commission's expert judgment in the absence of record evidence indicating that the Commission's assumption is a clear error of judgment, or a showing that the empirical assumption is facially implausible or inconsistent.

The FCC's predictive judgment that smaller and multi-state educational organizations will more easily qualify for the diversity credit is also on its face rational. It is rational to assume that the credit will capture the distinct, yet (in the FCC's judgment) less educational benefits that flow from favoring such entities, since those entities are less likely to have overlapping signals. If those entities are significantly more likely to be eligible for the diversity credit, then it is rational to assume that this credit will adequately account for those benefits, as the state-wide network credit does for large single-state networks. And because large, single-state educational entities cannot receive the state-wide network credit if they qualify for diversity points, there is less risk of double-counting the extent of those networks' distinct educational benefits. In sum, the FCC's reasonable assumption that

multi-state and regional networks are inferior educational providers, together with the prediction that those entities will typically be eligible for the diversity credit (while state-wide networks who receive the state-wide credit will not), is enough to make the credit nonarbitrary.

We caution, however, that we are not foreclosing any and all future challenges to the rationality of the state-wide network credit – or, for that matter, any aspect of the point system that relies on verifiable empirical predictions or assumptions. The Commission may well have a future obligation to reevalute the point system if the empirical predictions and premises it used to justify the point system turn out to be erroneous. As we have previously noted, the FCC's "necessarily wide latitude to make policy based on predictive judgments deriving from its general expertise implies a correlative duty to evaluate its policies over time to ascertain whether they work – that is, whether they actually produce the benefits the Commission originally predicted they would." *Bechtel v. FCC*, 10 F.3d 875, 880 (D.C. Cir. 1993) (internal quotation marks and citation omitted). For example, experience may establish that, contrary to the FCC's prediction, most multi-state and regional educational institutions will not be able to obtain diversity credits to compensate for the advantage the state-wide educational credit gives large single-state educational organizations. On the present record, however, the Commission's empirical assumptions and predictions are sufficiently rational to survive arbitrary-and-capricious review.

### 3. Rationality of the Attribution Rules

AFA challenges the rationality of the point system's attribution rules, which we described above. AFA's argument on this score is that the attribution rules arbitrarily favor public broadcasting networks like PBS and NPR over private religious networks like AFA. AFA points out, correctly, that the rules do not attribute control of NPR's and PBS's licensees to NPR and PBS, even though NPR and PBS provide those affiliates with money and programming. In contrast, because AFA and similar organizations own and control their affili-

ates, the attribution rules treat AFA as a single, large, nonlocal entity.

We do not consider the merits of this challenge because we do not believe that any party raised it with sufficient clarity before the FCC. It is black-letter administrative law that 47 U.S.C. § 405 bars us "from considering any issue of law or fact upon which the Commission has been afforded no opportunity to pass." *AT&T Corp. v. FCC*, 317 F.3d 227, 235 (D.C. Cir. 2003) (internal quotation marks and citation omitted). The FCC argues in its brief that no party to the Commission's proceedings challenged the rationality of the attribution rules. AFA does not respond to this argument in its reply brief. In response to questioning at oral argument, AFA's counsel said that this issue had been raised in comments by the Educational Media Foundation. The Foundation, however, argued that the attribution rules were unconstitutional, not that they were arbitrary and capricious. *Reh'g Order* ¶¶ 15–21. Because the constitutionality of the rules is distinct from its substantive policy rationale, we do not believe that a "reasonable Commission necessarily would have seen [that] question raised before [the Court] as part of the case presented to it," *AT&T Corp.*, 317 F.3d at 235 (internal quotation marks, emphasis, and citation omitted), simply because the Foundation challenged the constitutionality of the attribution rules. We therefore do not consider the merits of this claim.

4. Rationality of the FCC's System for Screening out Factually Incorrect License Applications

Oregon also takes issue with the FCC's system for verifying that NCE applicants actually have the attributes they claim on their license applications. We reject this challenge as well. Oregon claims, specifically, that the FCC irrationally failed to require NCE applicants to submit documentary evidence of their bona fide NCE status. We hold, once again, that the FCC adequately addressed this concern. The FCC noted that competing applicants have incentives to bring factually incorrect license applications to its attention, which they no doubt do. *Order* ¶¶ 88-89. Also, the Commission

said that it will delegate to its staff the task of developing documentation that will verify whether applicants qualify for the points they claim, and that the FCC staff will randomly audit that documentation for compliance. *Id.* Finally, the FCC said that it will conduct "acceptability" studies to determine whether the applicant with the most points is actually eligible. *Id.* ¶ 90. Even if Oregon is correct that these steps are inadequate to the task, that does not change the fact that there is a rational connection between them and the stated problem. The FCC's explanation is not arbitrary.

    5.   47 U.S.C. § 398

The final statutory issue we must address is Oregon's argument that the point system conflicts with 47 U.S.C. § 398. That section provides, in pertinent part:

> Nothing contained in this part shall be deemed . . . to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over public telecommunciations, . . . or over the curriculum, program of instruction, or personnel of any educational institution, school system, or public telecommunications entity.
>
>    . . .
>
> (c) Control over content or distribution of programs. Nothing in this section shall be construed to authorize any department, agency, officer, or employee of the United States to exercise any direction, supervision, or control over the content or distribution of public telecommunications programs and services, or over the curriculum or program of instruction of any educational institution or school system.

47 U.S.C. § 398(a) & (c).

Oregon argues that the final rule violates this provision because the rule directs "the curriculum [or] program of instruction" of educational institutions by influencing educational content. *Id.* § 398(a). We do not consider this argument on its merits because it was not presented to the Commission below. As Oregon concedes, the proper waiver

standard to apply under the law of the circuit is "whether a reasonable Commission *necessarily* would have seen the [§ 398] question raised before us as part of the case presented to it." *Time Warner Entm't Co., L.P. v. FCC*, 144 F.3d 75, 81 (D.C. Cir. 1998) (emphasis in original). The comments to which Oregon points did not preserve the issue under this standard.

Oregon argues that comments by the Educational Media Foundation and the Station Resource Group raised the question. However, those comments argued only that the FCC's explanation for favoring certain types of educational programming over others was irrational. Station Resource Group Pet. for Recons. at 8; *Order* ¶ 60. They did not mention § 398. Nor could the Commission have obviously inferred from the substance of the comments that § 398 was relevant to the issues they raised. Challenging the way in which the FCC regulates NCE content says nothing about whether the FCC can influence content at all. The FCC therefore had no opportunity to offer a construction of § 398 for our review. We are barred from deciding such issues in this procedural posture.

B.   Constitutional Challenges

Having rejected petitioners' statutory challenges, we must next consider their constitutional challenges. AFA claims that the point system is facially unconstitutional under the free speech and free exercise clauses of the First Amendment, and under the equal protection "component" of the Fifth Amendment's due process clause. Although AFA characterizes its argument as an "as-applied" challenge, given that the FCC applied the point system retroactively to licensees' pending applications and did not allow amendments, the substance of AFA's argument makes clear that it is challenging the point system not simply as it applies to the current pool of applicants, but also as it applies to future applicants. As the FCC points out, moreover, the Commission has not yet denied any of the license applications of AFA's affiliates. Any applicants whose applications are denied can seek review of those denials in this Court, and then have their as-applied claims tested. Therefore, we treat AFA's constitutional case

as a facial challenge. We hold that the system facially violates neither the First nor the Fifth Amendment.

1. Free Speech

The first issue is the appropriate standard of review to apply to the point system under the free speech clause of the First Amendment. AFA claims that the point system is content-based, and therefore that strict scrutiny is the appropriate standard of review. AFA's argument is that the point system favors nonreligious speech, like that broadcast on public television and radio stations, over the religious speech carried by AFA's affiliates. Therefore, AFA argues, the point system explicitly prefers some speakers over others. At a minimum, AFA continues, the regulations should be subject to some form of heightened scrutiny. We do not agree, and instead hold that rational basis scrutiny is the proper standard.

A review of the legal principles applicable to the radio and television broadcasting spectrum makes the error of AFA's argument clear. It is well established that content-netural "structural" regulation of the radio and television broadcast spectrum, "that is, [that] involving the 'where' and 'when' of broadcasting," *Ruggiero v. FCC*, 317 F.3d 239, 243 (D.C. Cir. 2003) (en banc), is generally subject only to rational basis scrutiny. *Id.* at 244 (citing *FCC v. National Citizens Comm. for Broad.*, 436 U.S. 775, 802 (1978) ("*NCCB*")). *See also Sinclair Broad. Group, Inc. v. FCC*, 284 F.3d 148, 167-68 (D.C. Cir. 2002); *Fox Television Stations, Inc. v. FCC*, 280 F.3d 1027, 1045-46 (D.C. Cir. 2002). The justification for this deferential standard, according to the Supreme Court, lies in the unique physical characteristics of the broadcast medium. Regulation of some form is an irreducible feature of any broadcast spectrum worth having, since "a finite number of frequencies can be used productively; this number is far exceeded by the number of persons wishing to broadcast to the public." *NCCB*, 436 U.S. at 798 (citing *Red Lion Broadcasting Co. v. FCC*, 395 U.S. 367, 375-77 (1969)).

This deferential standard is applicable here. The point system governs the structure of all of NCE broadcasting by

allocating its scarce spectrum among applicants. It is the quintessential example of a structural regulation "involving the 'where' and 'when' of broadcasting." *Ruggiero*, 317 F.3d at 243. The system is analogous to the cross-ownership rules the Supreme Court subjected to minimal scrutiny in *NCCB*, to the similar cross-ownership rules we subjected to rational basis scrutiny in *Fox Television Stations*, and to the television ownership rules we subjected to minimal scrutiny in *Sinclair Broadcasting*. AFA, like several others before it, *see Fox Television Stations*, 280 F.3d at 1045; *Sinclair Broadcasting Group*, 284 F.3d at 168-69, implies that we should discard the scarcity rationale as a relic of the past. AFA Reply Br. at 8-10. We dismiss this argument, as it is fundamental to the rule of law in our court system that "it is not the province of this court to determine when a prior decision of the Supreme Court has outlived its usefulness." *Fox Television Stations*, 280 F.3d at 1046 (citing *Agostini v. Felton*, 521 U.S. 203, 237 (1997)).

Like *NCCB*, *Fox Television*, and *Sinclair Broadcasting*, the present scheme is "not content related." *NCCB*, 436 U.S. at 801; *see also Sinclair Broad.*, 284 F.3d at 168. The FCC's stated purpose in promulgating the point system was, among other things, to promote a diversity of views. The diversity credit does that by advantaging applicants who do not already own licenses in given geographical areas. The localism credit supports the same goal by ensuring that applicants in many different regions have a voice in selecting NCE programming. The attribution rules advance the cause of localism by advantaging truly local stations over affiliates under the control of centralized organizations. Finally, the state-wide educational credit furthers diversity by advantaging educational organizations who might not otherwise have a voice on the radio, just as having an NCE broadcasting spectrum at all diversifies radio and television programming as a whole. Simply put, "[b]y placing a value upon diversity" the FCC "did not necessarily . . . value one speaker, or one type of speech over another; it merely expressed its intention that there continue to be multiple speakers." *Time Warner Entm't Co. v. United States*, 211 F.3d 1313, 1318 (D.C. Cir. 2000). For these

reasons, and for the reasons stated above in our discussion of AFA's statutory claims, the point system rationally advances these goals, and thus passes rational basis scrutiny.

AFA argues that the point system is content-based, and therefore is subject to strict scrutiny, in that it "reflects favoritism," AFA Br. at 20, for the secular viewpoints expressed by public radio and television networks over the views broadcast by religious networks. We are somewhat unclear on how AFA has inferred this nefarious motive from the rule. Nothing on the face of the point system inherently favors nonreligious speakers. Organizations are equally eligible for points whether or not they are religious. Religious groups may be established local entities, may be diverse, and may have superior technical capability. Religious schools, so long as they have five campuses or serve at least 50 elementary or secondary schools, are eligible for the state-wide educational credit on the same footing as state or nonreligious educational networks.

It is true, but irrelevant, that the affiliates of some sorts of nonreligious organizations, like the NPR and PBS networks, are more likely to get licenses than the religious affiliates of centralized organizations like AFA. That preference results only because such public affiliates are more decentralized, and therefore (in the FCC's view) will advance the content-neutral goals identified by the FCC better than the affiliates of centralized organizations like AFA will. As discussed, although NPR and PBS distribute programming to their affiliates, they do not own their affiliates, hold their licenses, or otherwise direct the content their affiliates may broadcast. The same is not true of AFA's network. There is nothing content-based about preferring decentralized broadcasters to centralized ones, given the FCC's motive. Because this case involves no explicit content-based discrimination, AFA's reliance upon *FCC v. League of Women Voters*, 468 U.S. 364, 381-83 (1984), is misplaced. The point system here, "unlike the ban on editorializing at issue in *League of Women Voters*, is not a content-based regulation." *Fox Television Stations*, 280 F.3d at 1046.

Nor is there any evidence from the justification the FCC gave for this scheme that its "manifest purpose [was] to regulate" religious speech "because of the message it conveys." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 645 (1994). As explained above, the FCC justified the factors the system favors by reference to advancing the goal of diversity. The closest AFA comes to identifying an explicit statement by the Commission evincing an intent to harm religious groups is the Commission's stated desire to prevent "large national chains" from crowding out small local educators. *Order* ¶ 34. That justification, again, is perfectly consistent with advancing the content-neutral goal of localism, and hence diversity.

### 2. Free Exercise

We also reject AFA's argument that the point system unconstitutionally infringes upon the First Amendment right to free exercise of religion. Citing *Church of Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 534-39 (1993), AFA argues that the system constitutes what the Supreme Court has called an unconstitutional "religious gerrymander." A religious gerrymander is possible when

> the circumference of legislation encircles a class so broad that it can be fairly concluded that religious institutions could be thought to fall within the natural perimeter.

*Walz v. Tax Comm'n*, 397 U.S. 664, 696 (1970) (Harlan, J., concurring). The unconstitutional gerrymander occurs when the bounds of legislation, like those of a gerrymandered political district, are artfully drawn to exclude the disfavored category–in this case, religious institutions. *Cf. Gomillion v. Lightfoot*, 364 U.S. 339, 341-42 (1960) (involving the gerrymander of city boundaries to exclude black voters). AFA's argument, while not clearly articulated, appears to be that the point system, though facially neutral and justified by reference to benign goals, benefits secular networks like NPR over religious ones to such an extreme degree that the inference of religious discrimination is plain. We see no such inference.

*Employment Division v. Smith*, 494 U.S. 872, 879-80 (1990), makes clear that the general rule is that laws and regulations that incidentally burden religion do not violate the free exercise clause. *Id.* at 879-80. However, even facially neutral laws and regulations violate the free exercise clause if in practical effect they target religious faith or speech to an extreme degree, and if those extreme burdens are not related to the legitimate governmental interests served by the regulation. *Church of Lukumi*, 508 U.S. at 534-39.

*Church of Lukumi* involved local ordinances that outlawed the ritual slaughter of animals. 508 U.S. at 536-38. In practical effect, the prohibitions fell "on Santeria adherents but almost no others." *Id.* at 536. The city defended the ordinance on the ground that the prohibition advanced the city's legitimate interest in protecting public health and preventing cruelty to animals. *Id.* at 538. The Court found that the ordinances were woefully underinclusive to advance those interests, *id.* at 538-40, 543-46, and inferred from this regulatory bluntness that the city's motive in passing the ordinances was to suppress religious belief, *id.* at 547.

The differential impact of the point system on AFA and similar organizations' religion is neither similarly severe and targeted nor so unrelated to the FCC's legitimate regulatory interests as to be a religious gerrymander. Though the point system's focus on localism and diversity no doubt disadvantages AFA and other religious organizations who happen to be centralized, the rule on its face appears also to disadvantage nonreligious centralized broadcasting networks. Similarly, the state-wide network credit concededly disadvantages AFA and religious educational organizations, but it also disadvantages nonreligious multi-state and regional school systems. It is just not true, therefore, that the burdens of the point system fall on religious organizations "but almost no others." 508 U.S. at 536. This is true even if AFA is correct that the point system prevents AFA from competing effectively with state universities and school systems. In the context of this facial challenge, we cannot say that it is clear on the face of the rule that its burdens are so focused as to burden virtually only religious speech.

Even setting aside that nonreligious organizations also face burdens from the rule, the burden the point system foists on religious organizations is relatively modest. There is nothing inherently related to religion in the point system's criteria. The system favors decentralization and diversity. Although it may be true that many religious NCE broadcasting networks are centralized, nothing inherent in their religious character forces them to structure their networks in this way. If AFA were to free its affiliates from its control, those affiliates could more easily compete with NPR's and PBS's affiliates under the system. A point system so easily turned to the benefit of religious organizations cannot be a religious gerrymander.

The point system, moreover, leaves ample alternative channels for religious speakers to let their voices be heard on the NCE airwaves. The rule does not prevent religious organizations from offering religious programming to NPR and PBS affiliates in competition with NPR and PBS. It does not prevent religious people from speaking on NPR and PBS affiliates, or prevent NPR and PBS from selling religious programming to their affiliates. If public broadcasting affiliates choose to be secular, or find the programming of NPR and PBS to be superior to AFA's, that is not a feature inherent in the point system; it is inherent, rather, in competition in the free market of ideas. Equally to the point, if NPR and PBS affiliates have a comparative advantage over AFA affiliates by virtue of being government funded, that is the result of a political choice of how to allocate public money. The advantage does not derive from the FCC's rule. If those funding choices make it difficult for AFA affiliates to compete with NPR and PBS affiliates without AFA's financial assistance, the proper way to deal with that consequence of those choices is through the political process through which those choices were made.

Finally, turning to the last *Lukumi* factor, we find that the FCC's legitimate interests reasonably relate to the burden the rule places on religious organizations. AFA claims that the point system does not advance the goal of having diversity of views on the airwaves, because NPR and PBS affiliates

predictably will purchase national programming from NPR and PBS. AFA misconceives the FCC's interest. The interest, as noted above, is in advancing diversity in the selection of programming, whatever the source, not in having different varieties of programming per se. That is why, as explained above, the FCC rejected the proposal to award points for local origination of programming. If NPR and PBS affiliates were, for example, to begin purchasing programming primarily from AFA and other centralized religious networks, the rule would equally advance the FCC's legitimate interest in advancing diversity in the selection of programming. Again, nothing in the rule requires NPR and PBS affiliates to select programming from a uniform source. Any such uniformity results instead from individual choice.

### 3. Equal Protection

AFA's last constitutional argument is that we should apply some form of "heightened" scrutiny to the point system under the equal protection "component" of the Fifth Amendment's due process clause (or, alternatively, at the "intersection" of the free speech clause and the equal protection "component" of the Fifth Amendment).

AFA cites primarily our decision in *News America Publishing, Inc. v. FCC*, 844 F.2d 800, 814 (D.C. Cir. 1988), which applied heightened scrutiny to an act of Congress that singled out "with the precision of a laser beam," a corporation controlled by Rupert Murdoch. Murdoch's corporation had applied for, and received, temporary waivers from the FCC's cross-ownership rules, so that the corporation could acquire two TV licenses, one in Boston, and the other in New York. *Id.* at 804. Subsequently, Congress passed a law that prevented the FCC from extending any existing temporary waivers; at the time, Murdoch's corporation was the only current beneficiary of any such temporary waivers. *Id.* at 814-15. The law, however, did not prevent the FCC from granting new temporary waivers, or from extending those new waiver grants. Because Murdoch's corporation was the only current possessor of a waiver, therefore, the burden of

this law fell only on his company. *Id.* This precision, we reasoned, warranted heightened scrutiny.

The point system's burden on AFA and similar religious networks falls far short of the laser-like precision present in *News America* that warranted heightened scrutiny. As we explained above, the point system both burdens nonreligious networks and benefits, both currently and potentially, religious networks. And also for the reasons stated above, the point system is far from "astonishingly underinclusive," *News America*, 844 F.2d at 814, in advancing its legitimate purposes. Nothing in the point system singles out religious organizations, either expressly or in effect.

### III.   Conclusion

For the reasons expressed above, we deny the petitions for review.